## ILLINOIS CENT. R. CO. v. INDIANAPOLIS UNION RY. CO.

(Circuit Court of Appeals, Seventh Circuit. March 4, 1925. Rehearing Denied June 3, 1925.)

No. 3394.

**1. Railroads ⬤➾138—Railroad using terminal facilities held not in position to complain of manner of apportioning charges for freight service.**

Railroad becoming joint user of union depot and terminal facilities *held* not in position to complain that, as affected freight service, traffic was·divided into two classes, depending on whether association furnished motive power and men, notwithstanding contract provided that service should be paid for on basis of wheelage; it having long settled on basis of such classification.

**2. Railroads ⬤➾138—User of terminal facilities held not in position to complain of manner of apportioning expenses of passenger traffic.**

Railroad which, at time of becoming user of union station and facilities, agreed to do its share of all that was being done by other companies under contract theretofore made, regardless of whether specific mention thereof had been made, *held* not in position to complain that, as related to passenger traffic, expenses were apportioned according to the number of trains rather than on basis of wheelage as provided in such contract.

**3. Railroads ⬤➾138—Railroad, user of terminal facilities, held not in position to complain that another member was not paying its full proportion of fixed rentals.**

Railroad which at time of becoming user of facilities of union railway company agreed to be bound by "any other mutual agreements" which had been entered into by companies using such facilities, though not specifically mentioned, *held* not in position to complain that another ·company had been relieved of paying its full proportion of fixed ·rental in consideration of a prior conveyance of certain proprietary interests, though such arrangement was not embodied in contract.

**4. Railroads ⬤➾138—Court cannot substitute its judgment of values for that of parties.**

On complaint by railroad using facilities of terminal railroad, which, by agreement, were managed by a' board of managers consisting of one representative from each company using such facilities, the court, in the absence of fraud or collusion, cannot substitute its judgment as to rental value of space rented to one of the companies for that of the parties as evidenced by their acts.

**5. Railroads ⬤➾138—Union company held unauthorized to add full cost of betterment, paid for in part by city, to its appraised value on which tenant lines paid interest.**

Where, pursuant to requirement of statute (Burns' Ann. St. Ind. 1914, §§ 8864–8872), union railway company elevated its tracks to eliminate grade crossings and collected one-fourth of cost from city, county, and street railway companies, *held* that it could not properly add whole cost to appraised value of its property on which

tenant companies were required to pay a stipulated interest, though contract creating company provided that "cost of such additions and betterments" might be so added, and that there was no practical construction of contract as authorizing it to do so.

**6. Railroads ⬤➾138—Union railway company held not entitled to charge income taxes on rentals received back to tenant roads as part of operating expenses.**

Where contract between union railway company and tenant roads required roads to pay stipulated interest on appraised value of company's property, with all expenses of operation and maintenance, including taxes, assessments, etc., *held* union company was unauthorized, in charging as part of expenses and taxes, which tenant companies had agreed to pay, federal income. taxes which company paid on annual rental received by it.          •

**7. Landlord and tenant ⬤➾148(2)—Covenant to pay taxes and assessments does not require payment of income tax on rent received.**

. Lessee's covenant to pay all taxes and assessments does not require him to pay income tax which lessor may be required to pay on rent received.

**8. Railroads ⬤➾139—Railroad suing union company on contract held not entitled to equitable relief in disregard of contract.**

Railroad, user of facilities of union railway company, seeking accounting and relief against company and predicating its rights on contract, *held* not entitled to equitable relief on ground. that contract was unjustly discriminatory.

Appeal from the District Court of the United States for the District of Indiana.

Suit by the Illinois Central Railroad Company against the Indianapolis Union Railway Company. Decree for defendant, and plaintiff appeals. Affirmed in part, and remanded, with directions to modify.

The appeal is from a decree denying all relief sought ·by appellant's bill filed May, 1921, for accounting by appellee for alleged overpayments under written contract for appellant's use of appellee's Union Station and Belt Railroad facilities at Indianapolis, and for specific performance of the contract, and damages for appellee's breach of it, and for injunctional relief against threatened ouster of appellant from further use thereof.          •

Appellee is an Indiana railroad corporation. Its stockholders are certain railroad companies or their successors, whose lines at the time of its organization ran into Indianapolis.    In 1883 the interested railroads entered into a written agreement which provided for the conveyance of their several terminal properties there to appellee, and for the acquirement by appellee of addition-

al property and construction of a new union station.

Section 5 of the agreement provides that an appraisement shall be made of all the terminal property, including the value of a lease for 999 years of the Belt Railway, and all of its equipment, and section 6 provides that the appraisement made in accordance with the provisions of that section "shall be conclusive upon all parties, and shall for all time to come constitute the basis on which fixed rental shall be computed and paid, as hereinafter provided."

The seventh section provides that interest at 7 per cent. per annum shall be computed upon such appraised value, and the amount thereof shall constitute the fixed rental to be paid annually by the several railroad companies making use thereof. "Said fixed rental shall be from time to time divided into as many equal shares as there are railroad companies using said property, and each company so using the same shall pay one of said shares. No abatement shall be made from the fixed rental so to be paid by each company, by reason of such company not using either the union passenger depot or the Belt Railway."

The eighth and ninth sections are:

"(8) The tracks of the Union Railway Company shall be used exclusively, as far as possible, for passenger train service and such local freight deliveries as may be necessary in consequence of location of freight houses and private sidings; all other freight transfers and deliveries shall be made over the Belt Railway. A separate account shall be kept of the use, for purposes aforesaid, of the tracks of the Union Railway Company and of the Belt Railway, also of all expenses connected with each system, growing out of the maintenance, operation, renewal, and replacement of the same, including taxes, assessments, insurance, wages and salaries, and moneys paid for damage to persons or property; and such expense shall be paid by the several companies using each system, in proportion to such use, on the basis of wheelage. In computing such expense, a proper division shall be made of the wages and salaries of employees and officers whose services shall be rendered in connection with both systems.

"(9) The fixed annual rental, provided for in article seventh, and the wheelage proportion of expenses, provided for in this article, shall be payable in lawful money of the United States of America, to the treasurer of said Union Railway Company, on or before the last day of each month following the month for which statements showing the amount due from each company as aforesaid shall be rendered by the proper officer of said Union Railway Company."

"Nothing herein contained shall import a liability upon either of the proprietary companies to make any additions or improvements to said Belt Railway or Union Railway Company property, save with the voluntary consent of such company. Subject to the foregoing provision, the Union Railway Company board of directors may from time to time provide additions and betterments which, in the opinion of the board of managers, hereinafter provided for, may be necessary to enable the business of the companies using the joint property to be properly accommodated. And the cost of such additions and betterments shall be added to the appraised value provided for in article fifth hereof, and seven per cent. interest thereon shall be computed and paid in the same manner as the fixed rental hereinbefore provided for."

The twelfth section provides that the current operation, maintenance, renewal, and repair of the Belt Railway and station property shall be conducted by a board of managers of one representative from each company using the property, under such rules as the board shall prescribe. The board is invested with authority to make rules governing joint employees, and terms upon which the property may be used in common; "and each company shall have equal privileges in the use of the joint property, and all financial transactions incident to maintenance, operation, and renewal of property shall be conducted wholly by the officers of the Union Railway Company."

The thirteenth section names seven other companies which may be admitted to joint use of the properties upon application and signing the agreement, and that any other than the proprietary companies are admitted to such joint use on condition that the rental and other payments provided shall be regularly and promptly made, and all the conditions of the contract and all rules and conditions prescribed by the board of managers be faithfully and fairly kept and maintained, and that, in case of failure so to do, the right to joint use of the property may be absolutely terminated on 30 days' notice from the chairman of the board of managers based on action of the board, that no other company than those mentioned shall be admitted to joint use of the property save with unanimous consent of the board of managers, and that no company so admitted

shall become a member of appellee, or have any proprietary interest in the company or its property, but that such interest shall remain in the then proprietary companies.

The fifteenth section makes provision for arbitration of any differences arising respecting the rights or duties of any company using the property.

Under date of April 30, 1906, an agreement in writing was made between appellee and the Indianapolis Southern Railway (appellant's predecessor) which recites in full the contract of 1883, and admitting the latter, its successors and assigns to joint use of the properties, subject to the terms of the 1883 agreement. The bill is for the enforcement of the 1906 agreement.

In submitting for approval draft of the last-named agreement, there was written on behalf of appellee a letter which referred to the status of a so-called "betterment loan of September 1, 1904, for $500,000," as to which a special arrangement had been made between the companies interested, and then stating as follows: "In entering into the proposed agreement with the Indianapolis Union Railway, your company will be expected to assume its share of the payments above referred to, and also any other mutual agreements (if there be any) which have been entered into by the companies using the facilities controlled by the I. U. Ry. Co., but which, through oversight, I may have failed to refer to; in other words, in entering into the proposed agreement, the Indianapolis Southern Railway Company agrees to do its share of all that is being done by the other companies, regardless of whether specific mention has been made of same either in the agreement or in this letter."

Under date of May 12, 1906, the following reply was made:

"Illinois Central Railroad Company.

"Chicago, Illinois, May 12, 1906.

"Mr. W. T. Cannon, Secretary, Indpls. Union Ry. Co., Indianapolis, Indiana—Dear Sir: In returning the contract to you today, I neglected to advise you that the matters mentioned in your letter of April 21st to our second vice president are understood and accepted. Kindly consider this letter as an acceptance of them.

"Yours truly,

"[Signed] W. J. Harahan,

"Fourth Vice President."

This company then went into joint use of the properties, and it and its successors have since remained in such use, appellant formally succeeding to this interest in 1910.

Further facts, and the matters in controversy, will be stated in the opinion. The cause was referred to the master, who heard it, and made findings of fact and law contrary to appellant's contentions. Exceptions to his report were overruled, and appellant's bill was ordered dismissed for want of equity.

H. M. Dowling, of Indianapolis, Ind., for appellant.

Joseph J. Daniels, of Indianapolis, Ind., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

## Classification of Expenses.

ALSCHULER, Circuit Judge (after stating the facts as above). [1] The main controversy revolves about the method of apportioning among the several tenant companies (meaning all the companies using these facilities) the expense of the service. As to the freight service of the Belt Line, it was appellee's long practice to classify mainly into such traffic as employed appellee's track facilities, making no use of appellee's locomotives and trainmen, and such as was moved by appellee's locomotives and employees, making the proportion of expense to be borne by the latter traffic larger than the former. Appellant insists that this is not a compliance with the provision of section 8 of the contract of 1883 that "such expense shall be paid by the several companies using each system, in proportion to such use, on the basis of wheelage." As to this, the master found that the apportionment was in fact made upon the basis of wheelage. In a sense this finding is justified by the evidence, since the apportionment within the different classifications is made upon the basis of the car and engine mileage of each tenant road. Appellant, which did not send over the Belt Line freight trains propelled by their own power, was at some disadvantage in the classifications which have been set up, as against a division of expense made wholly upon the car mileage of each tenant road, regardless of whether appellee's motive facilities were employed for moving some of it.

That cars, moved over appellee's road by the carrier's own power, should bear the same proportion of expense as an equal number of cars moved by appellee's power does not appeal to one's sense of fairness. If appellee, instead of being a carrier for the particular

roads that use it, was operating a railroad in the ordinary sense, it would doubtless charge less for trains moving over its tracks by their own power than for similar trains which it powered and manned. While section 8 does not fix any classification, it is fair to assume that some classification as would with ap-proximate fairness distribute the expense of this service, with some reference to its ac-tual cost, was contemplated, and that the term "wheelage" meant the wheelage basis as to all traffic falling within such classifica-tions, as would quite obviously be necessary for equitable distribution of the expense. That such classification was well understood and assented to by all the users before this entrant of 1906 began its use is abundantly manifest from the fact that, ever since the contract of 1883 became operative, the dis-tribution of expense was made by this same method of classification. And for nearly a quarter century the mileage reports of the companies were weekly made, and monthly expense bills rendered and paid. And for yet another decade after the contract of 1906 this was without objection the method followed, until in 1916, when appellant was the first to complain.

For appellant it is explained that these accounts are exceedingly complicated, where-as the accounting without classification would be comparatively simple. Surely appellant is not less efficiently equipped than appellee for dealing with all manner of railroad ac-counts, simple or complicated, and it has been at no disadvantage in this respect. The influence of its long practice of settling on this basis is not to be minimized by the com-plicated nature of the classified expense ac-counts. Without entering into discussion of the very numerous authorities on the propo-sition, we think this case fairly falls within those which establish that long and uniform operation under a contract by its parties, under no disability or disadvantage, gives to the contract such a practical construc-tion as may not be departed from at the be-hest of any one of such parties.

What has been said upon this subject is alike applicable to various other proposi-tions urged on behalf of appellant, depend-ing upon the contention that the classifica-tion is not warranted by the contract. We do not find any of the classifications now ob-jected to, such as might not have been fairly contemplated by the parties. The corre-spondence referred to in discussion of the next proposition has likewise direct bear-ing on this.

6 F.(2d)—53

Train Basis for Division of Station Expense.

[2] Appellant complains that the appor-tionment of expense of maintaining the Un-ion tracks and depot among the tenant roads has been on the basis of the number of pas-senger trains entering or leaving the sta-tion instead of wheelage as provided in sec-tion 8. Appellant contends that its passen-ger trains entering and leaving this station are usually much shorter than those of the other roads, and that the arbitrary train basis requires it to pay considerably larger proportion than on the basis of wheelage, or car and engine mileage. To those not deep-ly versed in the intricacies of railroading there would seem to be equitable merit in this complaint, though possibly neutralized in part when it is considered that the short train monopolizes a station track the same as the long, since none other can occupy it when it is there; and the short train requires very much the same depot service in the mat-ter of light, heat, gatemen, train callers, wait-ing rooms, baggagemen, ticket sellers, and the like, though in some respects perhaps not in the same proportion.

If this were a matter unmixed with con-ditions other than the contract itself, it might well be concluded that expense distribution on the train basis could not prevail since clearly not complying with the contractual specification of wheelage. There appears as to this the same long-continued practice as has just been considered, but with the rule of practical construction less applicable where the practice has been more definitely in conflict with the contract. Appellant is the thirteenth and last admitted of these co-tenant roads. The proprietary roads, five in number, signed the agreement of 1883. Shortly thereafter seven others entered. The twelve tenant roads had by a long and uniform practice fixed a status as between themselves which any of the tenants had pow-er to impose upon any newcomer as well, who could be admitted to fellowship only by unanimous consent of the board of managers. With the evident purpose of preserving such status, whether or not in strict compliance with the written contract of 1883, appellee, in sending to appellant's predecessor the con-tract of April 30, 1906, wrote it that, "in entering into the proposed agreement, the Indianapolis Southern Railway Company agrees to do its share of all that is being done by the other companies, regardless of whether specific mention has been made of the same either in the agreement or in this letter," and to which it was replied that the

matters mentioned in the letters are understood, and "this letter is an acceptance of them." This indicates a definite purpose and understanding that whatever was theretofore customarily being done by the then tenant companies, whether of benefit or burden, would be shared with them by the new tenant. While such an arrangement may be open to the objection of informality, it surely is not wanting in scope. The new tenant was apparently willing to take the chance of being bound by customs and practices between the tenants which the written words did not reveal. If it was interested to know what the cost of the service would be, it had only to examine some of the regular monthly statements from which would definitely appear "all that is being done by the other companies"—including the "train" instead of "wheelage" basis, as well as all of the "classifications" which are here in issue. That this was then known and understood and assented to by this tenant finds strong corroboration in the fact that the succeeding reports upon which its monthly settlements were made continued uninterruptedly on the same basis, unquestioned for ten years more. This correspondence is likewise applicable to all other of those usages and practices long existing between appellee and the tenant roads before this tenant was admitted, and not specifically covered in the contracts.

### Lake Erie & Western Railway Company's Proportion of Fixed Rental.

[3] Appellant objects that the Lake Erie & Western Railway Company, one of the tenant roads, instead of paying the full proportion of the fixed rental which all the other companies pay, is paying only 78.3 per cent. of its equal share. It seems that the predecessor of the Lake Erie & Western Company, in 1859, conveyed to the other proprietary interests or their predecessors, a certain interest it had in the Union tracks, and it was provided that its annual rental of the Union property then in use should be 78.3 per cent. of what was charged to the other users, and that ever since that time this has been the proportion which it has paid, both long before and ever since the agreement of 1883. For some reason this was not carried into that agreement. There appears a sufficient reason wherefor an understanding for a reduced proportion on the part of this interest would have been proper, and this was followed by about 23 years' acknowledgment of it by all those concerned, up to the making of the contract of 1883, and a similar course after that contract was entered into, for about 23 years more, without objection from any of those theretofore interested. From this it may be reasonably inferred that there was an understanding between these parties whereunder this reduced percentage of fixed rental in favor of this company existed, and that this should be regarded as one of those "other mutual agreements" referred to in the letter of April 30, 1906, which will require appellant "to do its share of all that is being done by the other companies, regardless of whether specific mention has been made of the same in the agreement or in this letter."

### Depot Rentals.

[4] There is an allegation that space in the upper floors of the station was rented to one of the proprietary lines at a rent far less than its fair value, and that the difference between the rent charged and a fair rental for the space should be credited upon the station expenses chargeable to all the tenant lines. The evidence does not warrant equitable relief in this respect. It is evident that such space cannot be classed with office buildings located in the commercial center of a city, and from the fact alone that, after the filing of the bill, the rent was increased, we cannot conclude the master was wrong in finding against this demand. We find nothing in the record to indicate fraud or collusion as to the rent, and for mere mistake in judgment of values the opinion of a court cannot be substituted for that of the parties as manifested by their acts. It does not appear that appellant's representative on the board of managers or any other member of the board ever made complaint on this score, and this alone tends strongly to support the finding thereon.

### City's Proportion of Track Elevation as Basis for Rental.

[5] Under the provisions of the applicable statute (Burns' Rev. Stats. Indiana 1914, §§ 8864–8872), the Union tracks of appellee leading to and through the Union Station and crossing various streets of the city were elevated. By the means of the statute, appellee was required to pay 75 per cent. of the cost, and the city, county, and street railway companies together 25 per cent. Appellee took charge of the work of making the entire improvement, commencing it in 1915 and continuing through a number of years; the aggregate cost which appellee paid being over $6,000,000, of which the municipality and

utilities have paid or will pay it approximately $1,500,000. Shall appellant be required to pay as permanent rental its contracted proportion of 7 per cent. of substantially this amount?

Appellee justifies inclusion of this capital charge under the ninth article of the agreement of September 20, 1883, which is: "Nothing herein contained shall import a liability upon either of the proprietary companies to make any additions or improvements to said Belt Railway or Union Railway Company property, save with the voluntary consent of such company. Subject to the foregoing provisions, the Union Railway Company board of directors may from time to time provide additions and betterments which, in the opinion of the board of managers, hereinafter provided for, may be necessary to enable the business of the companies using the joint property to be properly accommodated. And the cost of such additions and betterments shall be added to the appraised value provided for in article fifth hereof, and 7 per cent. interest thereon shall be computed and paid in the same manner as the fixed rental hereinafter provided for. "

Appellee's position is that "the contract does not say that the cost of the additions and betterments to the appellee or to the proprietary companies shall be the criterion. It simply says that the cost of the additions and betterments shall be added to the amount on which the fixed rental is based." We think this reasoning is much strained, and would prove entirely too much. By the same logic, if the entire cost of the elevation had been paid by the city or by the crossing street railway companies, which, in proportion to their traffic, were not less interested in or benefited by the elevation than appellee itself, appellee could charge this as a betterment just the same. If the surface lines had similar contracts with others for use of their facilities, and for the rental thereof, they might also charge it into their capital account and collect interest thereon as rental. Indeed what would prevent them from doing so, based upon the fact that they did pay a proportion of the entire cost—less, it is true, than appellee paid—but a proportion nevertheless, and by the same token sufficient to draw to them the right to charge the whole into the capital account.

We cannot see how, in this connection, the term "cost" of such additions and betterments could mean anything else than cost to appellee. There might be some basis for the contention if the provision were that the val-, ue of the betterment should be fixed by appraisement the same as the value of the property was fixed when appellee first took it over. If then the entire betterment were appraised at a price materially larger than the cost to appellee, such an agreement might justify its inclusion at the full value. But the contract specifically fixes cost, not value.

It is urged that appellee is owner of the property in fee simple, and that the 25 per cent. is a contribution by the others expended upon its property, which thus inures to appellee's benefit. That the right of way is appellee's is no doubt true. It may or may not own the real estate on which it is located, not, however, that very important part constituted by the public streets which it crosses, and but for which elevation would have been unnecessary. If it had not the right to cross these streets, the balance of its property would be of no avail for railroad purposes. The interest of the public and of the surface lines in abolishing grade crossings is surely not less than that of appellee. In the matter of actual expense, it is manifest that the work at the street crossings, which appellee does not own, constitutes a very considerable proportion of the cost of the entire improvement.

Some rulings of the Interstate Commerce Commission are referred to where it has been held that donations to railroads need not be excluded from their capital account. This may be conceded as generally true. Where to encourage the building of a railroad donations are voted or otherwise given it, there may be no reason for withholding this from its capital account. But here there is a joint enterprise for the benefit of the existing railroad, the public, and street railway lines which cross it, authorized and compellable by the laws of state. It cannot be said that the improvement thus made inures wholly to the benefit of any one of the several parties thus required to make it and contribute toward its cost.

But the ascertainment of what, under the contract of 1883, is cost of betterment, is not controlled by the reasons and principles which govern in fixing what is or what is not capital within the purview of the Interstate Commerce Act (Comp. St. § 8563 et seq.).

Surely under the agreement it can make no difference that appellee acted primarily as the disburser of the funds required to pay for the whole improvement, unless indeed it thereafter failed to collect the statutory proportion which the others were required to pay, which might raise another question.

The situation is not different than if the initial duty of paying for the improvement rested on the city or street railroad, with appellee thereafter paying its proportion of the cost, in which case it is not conceivable that appellee would have included the entire cost as a betterment.

It is insisted for appellee that here should be applied the rule of practical construction, that this work began in 1915, and that monthly bills were rendered and paid without objection, wherein was included in the fixed rental the proportion of interest on the entire sums paid out. The work began in 1915, and the amounts paid out were comparatively small at first. It does not appear that, during the earlier years in which appellee was paying out the entire expense, any payment had been made to it by the others. Indeed the evidence of its auditor, Bowman, is quite to the contrary. He testified for appellee: "These additions came about through the track elevation work, commenced in 1915, and subsequent thereto. These additions were made from proceeds of bonds floated by defendant and from public contribution. The track elevation was paid for entirely from the bond issue, plus what we collected from the tenant lines on account of property retired. There was no money paid in by the city, which we used, at that time, to make these payments. The investment in the property was made by money that we raised from the bond issue, and collected from the tenant lines on account of property retired. We rendered a memorandum statement against the city each month for a proportion of the total cost of the work that they were to bear, excluding items of land, rails, ties, and track material. The city did not pay them, and there was to be no accounting until the work was all completed. The city has made the payments in the amount appearing in the stipulation. These payments relate to the city's proportion of it—the amount they owe us over what we owe them."

This work was a single improvement, extending in its construction over a period of six years or more, scarcely completed when the original bill was filed, if indeed at that time. The city lagged behind in its contribution to the work, and it appears that at the beginning of the suit a very large sum was yet unpaid. In the statements rendered there was nothing to indicate when or what the city and the others had paid toward the improvement. While undoubtedly the tenant companies knew of the proportion to be paid by the others, it does not follow that, by inclusion of the entire amount in the monthly statements, they gave practical construction to the contract with the effect contended for by appellee. The very utmost that could be said would be that it was a recognition of the right of appellee to include in the rental interest on its disbursements for this betterment until such time as it was reimbursed for that part which the others were to bear. In any event, in the face of the plain provision of the contract, and without other qualifying conditions appearing, we would not be justified in according to the conduct of the parties respecting this matter the dignity and force of a practical construction by them.

As indicating at least the reasonableness and equity of appellee's undertaking to add to the betterment cost the proportion of the city and others, it is urged that the appraisal of the terminal property in 1884 at $1,171,-959.91, and the contractual provision that this sum, unaltered, shall remain the primary basis of the 7 per cent. fixed rental, gives appellee no advantage through the subsequent increase in the value of the property. This should have no influence in construing the contract. Parties in 1883 could not project themselves several decades forward and know that the property would actually increase in value. It was quite as likely to remain stationary, or even decrease. It must be remembered that this valuation is permanent, notwithstanding the decay, destruction, obsolescence, or inutility of any or all of it, and that all repairs and upkeep of the entire property must be paid by the users as expense in addition to the fixed rental, and the cost of all betterments becomes additional capital upon which 7 per cent. is permanently paid, notwithstanding current interest rates may have fallen far below that figure.

Appellant is entitled to abatement of its proportion of permanent rental based on so much of this betterment cost as is paid by the city of Indianapolis and others besides appellee, and to accounting for and return of whatever of such rental it has so paid, with interest.

### Federal Income Taxes.

[6] It is complained that appellee has been charging appellant a share of federal income taxes which appellee from year to year since 1910 has paid. Since the tenant roads use this property and pay, in addition to the so-called fixed rental, the entire ex-

pense of maintaining and operating the property, appellee has no operating income from it, and so far as the record discloses its income consists almost entirely of the annual rental which the tenant roads pay in equal shares, being 7 per cent. of an amount composed of the original appraised value, plus betterment costs. Appellant contends it is not liable under the agreement for any of such income taxes.

[7] A lessee's convenant to pay all taxes and assessments does not require him to pay income tax which the lessor may be required to pay upon the rent received. Jersey City Gas Co. v. U. G. Imp. Co., 58 F. 324, 7 C. C. A. 250 (3 C. C. A.); Suter v. Jordan Marsh Co., 225 Mass. 34, 113 N. E. 580; Young v. Ill. Athl. Ass'n, 310 Ill. 75, 141 N. E. 369, 30 A. L. R. 985; Des Moines Union Ry. Co. v. C. G. Ry. Co., 188 Iowa, 1019, 177 N. W. 90; Park Bldg. Co. v. Yost Fur Co., 208 Mich. 349, 175 N. W. 431; Codman et al. v. Am. Piano Co., 229 Mass. 285, 118 N. E. 344; Woodruff v. Oswego Starch Factory, 177 N. Y. 23, 68 N. E. 994. In Young v. Ill. Athl. Ass'n, supra, the cases are reviewed and from them the court properly concludes: "It has been the universal holding of courts considering the question, so far as we are able to find, that, unless the lease expressly provides for the payment of taxes on the income from rentals received under the lease, the imposition of such a burden on the lessee is not justified."

The applicable portion of the contract of 1883 (section 8) is: "A separate account shall be kept of the use, for the purposes aforesaid, of the tracks of the Union Railway Company and of the Belt Railway, also of all expenses connected with each system growing out of the maintenance, operation, renewal, and replacement of the same, including taxes, assessments, insurance, wages and salaries, and moneys paid for damage to persons or property; and such expense shall be paid by the several companies using each system, in proportion to such use, on the basis of wheelage." Appellee's income taxes are no part of the expense connected with the system, and in no proper sense grow out of maintenance, operation, renewal, and replacement of the demised property. There are no words or phrases in the agreement from which it might be inferred that the tenant roads undertook to pay as a part of the fixed rent any tax, assessment, or other charge upon the rent itself, once it comes into the hands of appellee. There is in this undertaking, nothing which would bring it within

those cases wherein lessees have been required to pay such a tax under covenants broad enough to include it, such as Phila., G. & N. R. Co. v. P. & R. Ry. Co., 265 Pa. 325, 108 A. 528; Phila. C. P. Ry. Co. v. Phila. R. T. Co., 263 Pa. 561, 107 A. 329; North Penn. R. Co. v. P. & R. Ry. Co., 249 Pa. 326, 95 A. 100. It is clear to us that payments by the tenants of such an item as an income tax upon appellee's rent was not contemplated by, and is not included within, the agreement.

Appellee insists that the fact that the income tax was charged to, and without objection paid by, appellant and the other tenants each year since 1910, indicates a practical construction placed upon the contract in this respect by the parties themselves, and should not be departed from. It seems to us that upon this subject the contract is too plain for construction. Young v. Ill. Athl. Ass'n, supra, and cases there cited. Of course, the correspondence heretofore referred to can have no application to the income taxes, which did not accrue until long after the agreement of 1906. We are of opinion that appellant should be relieved from payment of so much of such income taxes as it has not paid, and is entitled to have refunded with interest such payments on account of income tax which it has heretofore made, save such, if any, as are barred by the Indiana statute of limitations.

### Relief under Statutes and Common Law.

[8] In appellant's brief, after assailing the controverted charges as violative of the contract it is said, "They are also unlawful because unjustly discriminatory as against appellant, a common carrier of freight and passengers, contrary to the statutes and the common law governing the rights of common carriers to use the connections and facilities of other railroads"; and attention is called to the prayer of the bill for injunction to prevent appellant's ouster, and for general relief, as justifying the bringing of this issue into the case. The bill is not framed upon any such theory, but is predicated wholly upon appellee's alleged violation of its written contract with appellant. A claim that the terms upon which appellant enjoys the use of these terminal facilities are discriminatory against it, and therefore in contravention of its statutory and common-law rights, regardless of contractual relations, is radically different from a demand predicated upon and seeking enforcement of the very contract.

The prayer for general relief in a bill based wholly upon a contract would not in the nature of things permit of relief predicated upon the abrogation or disregard of the contract. Furthermore, if appellant would have relief from discrimination against it, and against that portion of the public which it serves, by lessening its share of a burden which must be by it and others in similar situation jointly borne, it may seek it through the channels pointed out by law, in a proceeding where all who would be affected by readjustment of the burden may have opportunity to be heard, but not in an action like this by one party to a contract against the other, to bring about its enforcement.

We sustain the decree of the District Court in all respects, save as to appellant's proportion of appellee's income taxes, and of interest on cost of track elevation which was paid by others than appellee; and, for the purpose only of ascertaining the amount involved in such two items, and modifying the decree respecting them in consonance with the foregoing views thereon, the cause is remanded to the District Court, with direction to ascertain and fix these amounts, and modify the decree accordingly.

The time for appellant's compliance with the decree as so modified shall be by the District Court extended for a reasonable period, and the costs of this appeal shall be divided equally between the parties.