Hillsborough, }
May 2, 1933. }

### BOSTON & MAINE RAILROAD
*v.*
### PETERBOROUGH RAILROAD.

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Demond* orally), for the plaintiff.

*Frank B. Clancy, Robert W. Upton* and *Laurence I. Duncan* (*Mr. Upton* orally), for the defendant.

PEASLEE, C. J.   By the plan adopted in drafting the lease, the rent to be paid was divided into two distinct parts, specified in two separate paragraphs numbered 1 and 2.   Paragraph 1 stated the obligations to be paid for the lessor.   These were all included under the general description "the operating expenses of the lessor."   Following this general phrase is a specification of what it includes.   The catalogue is rather minute, and what were apparently deemed different classes of obligations were separated by semicolons.   These classes are four in number.   The first covers maintenance of the physical property described as "repairs and renewals."   The second includes obligations to others incurred in the course of operating the road.   It describes them as "any contract, obligation, business,

negligence or misfeasance . . . in any way connected with the use and operation of the demised premises." It is as a part of this class that the provision as to taxes is found. The language used is, "including damages to persons or property, insurance, all taxes of every description, Federal, State or Municipal upon property, business, franchises or capital stock." That is, the lessee agreed to pay all taxes of the specified classes which were "in any way connected with the use and operation of the demised premises." To come within this limitation, taxes upon property must have been assessed upon "the demised premises," those upon business must be upon that carried on by virtue of the lease, and the franchise tax must have been laid upon the franchise to operate the leased road. The tax upon capital stock would be in substance one on the property represented by the stock. *Conner* v. *State*, 82 N. H. 126, 130, and cases cited. The fourth division in the paragraph provides for the payment of the organization expenses of the lessor at a fixed rate.

There is in this paragraph nothing indicative of an agreement to pay taxes assessed against the lessor for some reason other than the ownership or use of its railroad property and franchise. Taxes assessed upon other property and because of other incidents were not assumed by the lessee. The provisions upon this subject, whether looked at generally as a whole, or considered in itemized detail, afford no ground for a claim that taxes foreign to the operation of the road were intended to be included.

The only connection that the tax here in question sustains to the leased premises or the lessee is the fact it was levied upon the purchase price received for the use of the property. It was not levied because that price was paid, but because it was received by the lessor, and became income when received. Taxability did not depend upon the fact that the income was received from this source.

If there had been any intention to include it in the obligations assumed by the lessee it is fair to assume that it would have been stated. An obligation of this kind would not have been left to doubtful inference. This view is strengthened by the fact that in the lease which preceded the present one there was an express ageement to "pay all taxes . . . on said section of road . . . and also all government taxes upon the rental or dividends aforesaid."

The second paragraph provides for the payment to the lessor, semi-annually, "the sum of seven thousand and seven hundred dollars ($7,700) being two per cent (2%) upon three hundred and eighty-five thousand dollars ($385,000) its capital stock now outstanding." This

payment is there denominated "rent." There is nothing in this paragraph which can be construed into a promise or guaranty that the rent so paid will not be taxed in the hands of the lessor, or that it shall all be available for distribution as dividends to stockholders.

Undoubtedly the two paragraphs, taken together, indicate that the lessor sought to relieve itself of certain charges against its gross income. But there is no promise by the lessee to pay all charges. The obligations assumed were specific, and of course include only that which was specified.

It is in answer to this claim that there was an agreement to make the rent net income to the lessor that the third division of the first paragraph is of importance. It reads: "any expenditures hereinafter declared to be operating expenses." This plainly implies that the lessor might be subject to expense which the lessee had not, up to that point in the lease, agreed to pay. There is nothing following it relating to taxes.

The above quoted phrase also implies that the parties understood that the lessor might have expenses not included in the lessee's obligation, and that if anything were to be included in the operating expenses of the lessor it must be mentioned. This thought is as applicable to what precedes the third division as to that which follows it.

Had the parties understood that the lessee agreed to take care of all expenses so that the money rental to be paid the lessor should all be available for dividends, this third clause would have been superfluous. Its inclusion in the lease strengthens the idea that the lessee made no general promise to pay everything, but only bound itself as to the items specified.

The argument that there is implicit throughout the lease the idea that the money paid to the lessor semi-annually was to be available for dividends, at once suggests the inquiry: If there had been such an agreement why was it not expressed? Why state all these details of charges assumed if there was a general promise to pay all charges?

The internal evidence furnished by the language of the lease indicates that the lessee, while willing to take the chance of some future and presently unknown charges, carefully limited its liability therefor to the items specified. In no other way can the form of the promise to pay be accounted for. The agreement claimed by the lessor is capable of direct and explicit statement. A promise to pay "all charges and expenses of the lessor, and in addition thereto a net sum which shall be available for dividends at the rate of two per cent semi-annually upon its capital stock" would cover all. The absence

of any similar provision in a lease that was to run nearly a hundred years, is significant to the effect that the parties had no such intent.

It is strongly urged that the provisions of Article V of the lease show that the lessee undertook to assure the lessor's stockholders net dividends equal to the money rental paid to the lessor. That article relates to additions to the leased premises. It provides for the issue of new stock to cover the cost, and that such stock shall "be deemed part of the lessor's capital stock within the provisions of Article I, Clause 2, above, and shall receive dividends at the rate of two per cent (2%) semi-annually." This, it is said, demonstrates that the parties understood that the rent to be paid under the earlier provision was to be net to the stockholders.

At the best, this provision must be deemed to be an inartificial expression of the thought sought to be conveyed. Although it is not promissory in form, the object of inserting it must have been to indicate the lessee's promise to pay rent. It was not an arrangement between the corporation and its stockholders. It follows that the language used cannot be taken literally.

No action was taken under this article relating to additions and no question arises as to the right of holders of stock thereunder, or of the corporation to claim net rental so far as measured by the terms of that article. If it is doubtful how far it obligated the lessee, that matter ought not to be prejudged collaterally. However preposterous any action under Article V may now appear, no one can safely forecast what conditions may develop in the half century the lease still has to run. The matter can be left in abeyance, for upon any interpretation of this provision the meaning of the main covenant is not altered. If Article V was designed to embody a restatement of the main promise to pay rent, the subsidiary obligation, relating to a remote future transaction which might never take place, must yield its inconsistencies to the main covenant for present performance.

The further argument is made that it is not a question of inconsistencies, but of finding the true meaning of both provisions when read together, that so read they are consistent, and signify an agreement in each instance that the lessee was to pay all the lessor's expenses so that the stated rental would be available for dividends, whether paid under Article I or Article V.

It appears to us that this argument should not prevail since there is no such doubt as to the meaning of the main covenant as would warrant such an enlargement of its terms because of the dubious language of the secondary one. As before pointed out, the main

covenant is specific as to what the lessee promises to pay. The subsidiary one is at the most an illy phrased statement of an obligation of the lessee. Read in the light of the principal one, to which it in terms refers, it is explained thereby. If the two should be read together and be deemed variant statements of an obligation of like extent the result would be that Article V means that the lessee will pay to the lessor a cash rental equivalent to two per cent semi-annually upon the stock to be issued, as provided in Article I, concerning the obligation there computed upon the basis of stock already issued.

In no event, nor upon any interpretation of its language does Article V serve to change the conclusion reached as to the meaning of Article I. The lessee was to pay the charges specified in paragraph one and the stated rent as provided in paragraph two. It assumed no further obligation.

It is also claimed that the rights of these parties are determined by the practical construction of the lease over a period of years. There was no occasion for any such action until 1913, twenty years after the lease was executed. The tax then levied was small ($154 annually) and was paid by the lessee for three years. For the next three years the road was under the control of a federal manager and a federal receiver. Upon the return of the property to the plaintiff in 1920 it paid the tax of between one and two thousand dollars for five years. In two of these years it made a consolidated return as for affiliated corporations. The return showed no tax payable. This return was rejected by the government, and the plaintiff paid the tax, but not until after it had stated its position to the defendant, in 1924.

Practical construction derives its value from the presumption that it evidences the original understanding of the parties. It is apparent that this involves a human element even when the parties are corporations. It is also apparent that there is little likelihood that the actors of 1913 to 1924 were the same persons who expressed the corporate consent to the original contract twenty to thirty years before the tax was paid. Added force is given to this consideration by the fact that in the meantime the lessee had assigned its interest to the Boston & Maine, and the original lessee had ceased to be an actor in the execution of the lease. The acts done from 1913 on were induced by a misinterpretation of the written lease. They were not taken because the actors applied a known intent, held by them in 1893.

The law of evidence seeks to direct a rational search for the truth. Where inferences are permitted to be drawn, they must rest upon a reasonable basis of fact. The fiction of corporate entity, as a contin-

uing, accountable one, is not to be extended to cases where its use leads to a manifest absurdity. Such an instance would be created if the doctrine of practical construction by the parties were applied to corporate acts done in the execution of a contract made before the individuals directing the action were in control of the corporate affairs. While such acts might undoubtedly be treated as corporate admissions and therefore bases for an estoppel if acted upon by the opposing party, they would lack entirely the quality of expressing the understanding which preceded the execution of the contract.

The use of practical construction by the parties as an aid in determining what they meant by the language contained in their contract, is but an application or extension of the principle underlying the rule that the circumstances under which words are uttered are admissible in explanation of their meaning. The inquiry is what did these words signify to these parties when spoken or written. The consensual acts of the parties are received in evidence, to show the intent of the parties, "to show their understanding" when they used the words. *Morrill* v. *Weeks*, 70 N. H. 178, 180. "The question being what the language meant to the parties using it, their understanding as evidenced by their acts," may be shown. *Day* v. *Towns*, 76 N. H. 200, 202.

As before stated, the whole theory of the use of this class of evidence rests upon the assumption that the language of the contract is that of a sentient being, influenced in his choice of words by tradition and environment. "In truth, there can be only *some person's* meaning; and that person, whose meaning the law is seeking, is the writer of the document." 5 Wig., Ev. *s.* 2462. Argument is not required to show that such meaning is not evidenced by the acts of a succeeding generation. That is the situation here, and the doctrine of practical construction is not applicable.

The same conclusion has been reached in another jurisdiction. "The reason of the rule of practical construction has its origin in the presumption that the parties to the contract, at and after the making thereof, knew what they meant by the words used, and that their acts and conduct in the performance thereof, are consistent with their knowledge and understanding, and that therefore their acts and conduct show the sense in which the words were used and understood by them. In such cases acts sometimes speak louder than words. But the reason of the rule ceases when the acts or conduct are not those of the parties who made the contract, and are not presumed to know in their own minds what was in fact meant by the words used. The

acts and conduct of the parties following after the parties who made the contract, must in the nature of the case be only their own construction of the words used, and not an acting out of the understanding of the words by the parties who used them." *Cincinnati* v. *Company*, 53 Oh. St. 278, 287.

Whether this argument from claimed practical construction should also be rejected because its allowance would violate the alleged rule prohibiting the contradiction of a "plain meaning" of the language of the contract (*Stony Brook Railroad* v. *Railroad*, 260 Mass. 379), is a question which need not be decided, and upon which no opinion is intended to be expressed. See 5 Wig., Ev. *s.* 2462.

It is argued that the federal corporation income taxes, imposed since 1913, must be held to be excises, similar to those under the act of 1909. The reason advanced is that in no other way can the corporation tax be sustained, when levied at a rate differing from that imposed in the case of individuals. *Brushaber* v. *Railroad*, 240 U. S. 1 and *Flint* v. *Company*, 220 U. S. 107, are cited by both parties as sustaining their contention upon this question. The matter does not appear to be definitely disposed of by the authorities.

But even if the income tax were to be treated as an excise upon business, it does not come within the classes specified in the lease. The business upon which taxes were assumed by the lessee was that of operating the railroad. The lessee had no concern with the separate and distinct business of receiving rent for the privilege of using the lessor's property and exercising its franchise. As to taxes upon such business, the lessee made no promise.

The plaintiff is not bound to pay the tax here in question.

*Case discharged.*

All concurred.