## In re CENTRAL OF GEORGIA RY. CO.

### No. 4829.

District Court, S. D. of Georgia, Savannah Division.

Nov. 4, 1942.

Lawton & Cunningham, of Savannah, Ga., for Merrel P. Callaway, Trustee.

Hull, Barrett, Willingham & Towill, of Augusta, Ga., for Augusta & Savannah R.R.

LOVETT, District Judge.

The main question now for decision is whether a long term lease of a railroad must expressly, directly and in words provide for the payment of federal taxes on income from rentals to justify the imposition of such a burden on the lessee.

The issue arises in this way: The debtor, a Georgia corporation, is being reorganized under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The Augusta and Savannah Railroad, owned by a Georgia corporation, on October 24, 1895, was leased to the debtor for a term of 101 years with a perpetual right of renewal. Recently the trustee of the debtor, under an appropriate order of the court, adopted the lease for the period of the bankruptcy proceedings; and at the same time has asked the court to determine the question of where the liability for federal income taxes

assessable to the lessor rests under the language of the lease.[1]

The lease contains these covenants and recitals:[2]

1. The lessee shall pay as an annual rental "the sum of $51,145, being equal to 5 per centum upon the amount of the capital stock of the said lessor", and

2. Shall pay the salaries of the president and secretary of the lessor corporation up to a stated sum, shall provide free transportation over lessee's whole system for these officers, and shall pay certain other corporate expenses stated in the lease, and

3. Shall pay "all Federal, State, County or Municipal taxes and assessments, ordinary or extraordinary, then resting or thereafter to be lawfully imposed upon the Lessor or its property under its charter and the Constitution and laws of the State of Georgia or of the United States".

4. "It is the intention of this contract that the lessor shall have and receive during the period of this lease, and any and all renewals thereof, the amount of said rental free from and without any deduction whatever, but nothing herein contained shall be so construed as to make the lessee . . . in any way liable or responsible for any indebtedness or liability which may be created by or arise from the acts of omission or commission of any director or other officer or employee of the lessor, unless done at the express instance or request or assent of the lessee; but neither party to this contract shall in any manner become liable for the acts of the other party, except insofar as they herein expressly authorize it".

The lease to be interpreted was a modification of an older one made in perpetuity on May 1, 1862 by the lessor to the Central Railroad and Banking Company of Georgia, of which the debtor is the successor. Under that lease the annual rental was equivalent to 7% of the amount of the capital stock of the lessor. It contained a covenant that the lessee agreed "to pay all taxes that may legally be imposed by the Confederate States of America on said Railroad leased as aforesaid, the tax imposed by the State of Georgia to be paid by the said The Augusta and Savannah Railroad" (lessor).

The "tax imposed by the State of Georgia" was fixed by the charter of the lessor granted by the legislature of Georgia in 1838, and was in the nature of an income tax. The tax was "one-half of one per centum on its annual income", and was in lieu of ad valorem taxes.[3] The net amount, therefore, received under that lease and available for dividends to stockholders was slightly less than 7% annually upon the amount of the lessor's capital stock.[4]

The original lessee, Central Railroad and Banking Company, went into equity receivership in this court in 1892, and was reorganized in 1895. The reorganization plan provided for the formation of the Central of Georgia Railway Company, which should take over substantially all of the properties of the old railroad company, including the leaseholds.

On June 19, 1895, on motion of lessor's counsel, a distinguished and capable member of the Georgia bar, the president was authorized by the directors to execute a new lease to the reorganized company when incorporated, with certain provisions to be included therein, among others, "* * * at the annual rental of five per cent on the capital stock of this company, payable semiannually * * * the lease [lessee] to provide for and assume the payment of all taxes or assessments now due or which hereafter may become payable by this company to the State of Georgia, and [sic] county or municipality, or the Federal government as a *direct* or an *income* tax" (em-

---

[1] There is also a controversy between the lessor and the debtor's (lessee's) trustee in reorganization as to the liability of the latter for interest on arrears of rentals that were unpaid at the time the lease was adopted by him. This question will be dealt with also in this opinion.

[2] The facts herein recited are not in dispute and have been stipulated by the parties.

[3] Georgia Laws, 1838, p. 174.

[4] Other railroads in Georgia hold like charters. These tax limitations turned out to be of great value as the rate was low and the courts decided the limitations inured to the benefit of the lessee and were irrepealable contracts. See Central R. & Banking Co. v. Georgia, 92 U.S. 665, 23 L.Ed. 757; Southwestern R. v. Georgia, 92 U.S. 676, note, 23 L.Ed. 762; Southwestern R. Co. v. Wright, 116 U.S. 231, 6 S.Ct. 375, 29 L.Ed. 626; Wright v. Georgia R. & Banking Co., 216 U.S. 420, 30 S.Ct. 242, 54 L.Ed. 544; Wright v. Central of Georgia Ry. Co., 236 U.S. 674, 35 S.Ct. 471, 59 L.Ed. 781; Central of Georgia Ry. Co. v. Wright, 248 U.S. 525, 39 S.Ct. 181, 63 L.Ed. 401; Id., 250 U.S. 519, 40 S.Ct. 1, 63 L.Ed. 1123.

phasis mine). The president of the lessor company, who presided at the directors' meeting, was also an outstanding member of the Georgia bar.

On August 6, 1895, the stockholders of the lessor company also acted by resolution. They accepted the reorganization plan insofar as it related to their railroad and agreed to cause a lease on its railroad for 101 years to be executed, "the same as now enjoyed by the Central Railroad and Banking Company of Georgia, under the lease dated May 1st, 1862". The resolution then recited, "the proposed draft of the lease now submitted be and it is hereby accepted". A copy of the proposed lease follows in the minutes and is substantially the lease finally executed. In like manner on October 24, 1895 the directors of the lessor company adopted resolutions authorizing the execution of the new lease. These resolutions recited that the proposed draft of lease was "intended as a renewal of, and substitution for" the original lease of 1862. The new lease as executed refers only to the resolution of the directors of October 24, 1895.

It will thus be seen these changes in the old lease were made:

1. Substitution of a new lessee;

2. A term of 101 years, with the perpetual right of renewal, instead of a perpetual lease in the beginning;

3. Reduction of the stated, fixed annual rental from the equivalent of 7% to 5% of the lessor's capital stock;

4. An expanded covenant relating to taxes and assessments which should be paid by the lessee in addition to the stated rentals.

A few months before the lease of 1895 was negotiated and the formal contract executed the Supreme Court of the United States by a divided court held the federal income tax law of 1894, 28 Stat. 509, to be violative of the Constitution of the United States, as it was a direct tax, and was not apportioned among the several states as required by Sec. 2, Art. 1.[5] While this decision provoked wide discussion at the time of the necessity and wisdom of an amendment of the Constitution, it was not until 1909, some fourteen years later, that the Sixteenth Amendment was proposed, and after four more years (1913) it was ratified.

In 1895 Georgia lawyers were not unacquainted with income taxes as a possible source of revenue, and, of course, those familiar with railroad charters like that held by the Augusta and Savannah Railroad knew of their tax exemptions from ad valorem taxes through a tax based upon a percentage of annual income. The Supreme Court of Georgia theretofore had twice considered the power of municipal governments to levy taxes on earnings or income. Both of these cases arose in Savannah where the principal offices of the lessee were located.[6] In one of these cases the law firm of which the president of the lessor company was a member was of counsel, and in that case the Supreme Court said "It will not be disputed that *income* is a legitimate subject of taxation" (by the State).

In the light of these several decisions by the highest courts of the State and the United States the language in the resolution of the board of directors of the lessor company of June 19, 1895, referring to taxes and assessments which thereafter might become payable by the lessor to the "State of Georgia, and county or municipality or the federal government, as a *direct* or an *income* tax", may take on added significance and aid in the interpretation of the language to be construed. This is particularly so if the language of the resolution was communicated to the lessee. It seems unlikely information as to the language of the resolution would have been withheld. The officers of the two corporations were men of the highest character and I feel sure they dealt with each other in the negotiations of the new or modified lease with entire candor and good faith.

From the year 1913, when the federal income tax law now in effect as amended was first enacted,[7] to June 19, 1940, when these proceedings for reorganization in bankruptcy were instituted, the lessee (debtor) and its equity receiver[8] paid all of the

---

[5] Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759, on rehearing 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108.

[6] See Mayor, etc., of Savannah v. Hartridge, 8 Ga. 23; Waring v. Mayor, etc., of Savannah, 60 Ga. 93.

[7] Act October 3, 1913, c. 16, 38 Stat. 172.

[8] The lessee was in equity receivership in this court from December 19, 1932 to June 19, 1940.

federal income taxes assessed to the lessor.[9]

Since June 19, 1940 advancements have been made by the trustee in these proceedings to the lessor to pay income taxes "as provided in the lease" under orders of the court, but these orders provided that all advances should be "subject to adjustments . . . as may be determined by the court when the said Trustee or Trustees elect to adopt or reject the lease . . this order shall not prejudice the rights of any of the parties to the cause".[10]

Continuously since 1895 the lessor has owned stocks and bonds producing income. It has always paid its own federal income taxes on that portion of its earnings. It has never been reimbursed by the lessee for these payments, nor has it ever made any claim for such reimbursement.

The argument of the lessee's trustee proceeds upon the postulates that the tax clause in the lease is clear and unambiguous in its terms, its meaning is to be found within its four corners, and as there was no federal income tax levied—indeed, no constitutional authority for one—when the lease was made, it must be assumed in the absence of express language to the contrary the parties did not have it in contemplation and did not intend to place the burden of such a tax subsequently levied differently from where the law placed it; that this is particularly so where the words used in the lease do not demand another construction; and that practical construction by the parties is of no consequence because it is not contemporaneous and the lessee's trustee in reorganization is not bound by what the lessee corporation or its receiver did.

The lessor, disagreeing as to where the burden lies, agrees the terms of the lease are clear. It argues that the language demands a construction requiring the lessee to pay the taxes; and, if this is not so, that there is an ambiguity in the lease, whether patent or latent being immaterial; that when its history and the attendant circumstances of its negotiation are considered it will appear the parties intended income taxes should be paid by the lessee, and that the lessor should receive 5% net on its capital stock as rentals without having to contribute part of it to any public body for tax purposes, so as to enable a like dividend to be paid to its stockholders annually as the rentals were received; and that this intention is made manifest by the conduct of the parties since 1913.

Lessor and lessee's trustee agree that the contractual rights and obligations created by the lease are to be determined by the laws of Georgia, as presumably the lease was executed, i. e., the last consummating act to be done was done, in that state. I also agree. Certainly performance was to be in Georgia, both lessor and lessee lived there, and the leased premises were in that state. See Restatement of the Law (Conflict of Laws), Secs. 346, 358; 11 Elliott on Contracts, Sec. 1117; 11 Beale Conflict of Laws, Sec. 341; 17 C.J.S., Contracts, § 356; 11 Am.Jur., Secs. 100, 116; Scudder v. Union National Bank, 91 U.S. 406, 23 L.Ed. 245; Pritchard v. Norton, 106 U.S. 124, 1 S.Ct. 102, 27 L.Ed. 104; Alropa Corp. v. Rossee, 5 Cir., 86 F.2d 118; Pratt v. Sloan, 41 Ga.App. 150, 152 S.E. 275, and cases cited.

So far as counsel and the court have been able to discover there are no controlling decisions of the courts and no applicable statutes of Georgia that determine the question presented. Decisions of courts of other states are of no great assistance as long term leases vary greatly in the language of their covenants touching assumption of taxes by the lessees. Besides, the decisions are conflicting. In New York and other

---

[9] The equity receiver with the approval of the court paid these taxes from December 19, 1932 to June 19, 1940 under a modified lease renegotiated with the lessor.

[10] The total federal income taxes assessable to the lessor since 1913 paid by the lessee and its receiver, including the amounts paid or advanced by the trustee in reorganization, are $182,474.77. During the period from January 1, 1933 to July 1, 1942 the amount was $72,-850.17. From January 1, 1933 to May 31, 1942, the nearest comparable dates where the figures are available, according to formulas for segregation of earnings used by the receiver and trustee, though not judicially approved, the result from operations of the leased line was net income available for rent etc., after payment of income taxes, of $654,737. (These figures do not include the period from June 20 to December 31, 1940, when the formulas were not applied). Traffic exchanged with the leased line for the same period produced gross for the lessee an average of approximately $910,000.00 annually. The cost of handling this exchanged traffic, so as to arrive at the net figures, has not been shown.

states, for example, it is rather rigidly held the covenant is not within the terms of the contract unless the obligation is clearly and directly specified,[11] while in Massachusetts and elsewhere the courts say the rule in their commonwealths is not so inelastic, and if it fairly appears from the lease as a whole the intention was to impose the burden on the lessee that intention will be given effect.[12]

We come back, therefore, to first principles in the interpretation of contracts. The cardinal rule of construction, of course, is to ascertain the intention of the parties. If that intention be clear and sufficient words be used to express it, it shall be enforced irrespective of all technical or arbitrary rules of construction.[13] To aid in arriving at the true interpretation resort may be had to all the attendant and surrounding circumstances; if there is ambiguity, it may be explained; the whole contract should be looked to; and if the construction be doubtful that which goes most strongly against the party undertaking the obligation is generally to be preferred[14]. Where ambiguity exists the construction given by the parties will be given great, some times controlling, weight by the court.[15] There is another rule of construction that an instrument is to be construed most strongly against the party who prepares it, but here we do not know who wrote the lease—the evidence is silent on that subject.

[11] See Brainard v. New York C. R. Co., 242 N.Y. 125, 151 N.E. 152, 154, 45 A.L.R. 751; Van Rensselaer v. Dennison, 8 Barb., N.Y., 23; Woodruff v. Oswego Starch Factory, 70 App.Div. 481, 74 N.Y. S. 961, affirmed 177 N.Y. 23, 68 N.E. 994; United States v. Warren R. Co., 2 Cir., 127 F.2d 134; Illinois Cent. R. Co. v. Indianapolis Union R. Co., 7 Cir., 6 F.2d 830, 837; Des Moines Union Ry. Co. v. Chicago Great Western Ry. Co., 188 Iowa 1019, 177 N.W. 90, 9 A.L.R. 1557; Atlantic & Danville Ry. Co. v. Southern Ry. Co., 149 Va. 701, 141 S. E. 770; Young v. Illinois Athletic Club, 310 Ill. 75, 141 N.E. 369, 371, 30 A.L. R. 985; Catawissa R. Co. v. Philadelphia & R. Ry. Co., 255 Pa. 269, 99 A. 807; Boston & Maine R. R. v. Peterborough R. R., 86 N.H. 217, 166 A. 275; Boston & Maine R. R. v. Wilton R. Co., 87 N.H. 416, 181 A. 545, 547 (in which it was said "if it had been provided simply that 'said second party hereby covenants and agrees * * * that it will pay all public taxes * * * whatsoever that shall be placed upon said first party,' the obligation of the plaintiff * * * would be clear"); Stony Brook R. Corp. v. Boston & M. R. R., 260 Mass. 379, 157 N.E. 607, 53 A.L.R. 700; Codman v. American Piano Co., 229 Mass. 285, 118 N.E. 344; Owen v. Fletcher Sav. & Tr. Bldg. Co., 99 Ind.App. 365, 189 N.E. 173; Park Bldg. Co. v. Yost Fur Co., 208 Mich. 349, 175 N.W. 431; Elliott v. Winn, 305 Mo. 105, 264 S.W. 391; Laclede Gas Light Co. v. St. Louis Union Trust Co., 321 Mo. 782, 12 S.W.2d 432; Riesenberg v. Primary Realty Co., 214 Mo.App. 43, 258 S.W. 23; New Brunswick & Canada R. Co. v. New Brunswick R. Co., 4 D.L.R. 962 (by a divided court).

[12] Boston & Providence R. Corp. v. Old Colony R. Co., 269 Mass. 190, 169 N.E. 157; Pittsfield, etc., R. Corp. v. Boston & Albany R. Co., 260 Mass. 390, 157 N. E. 611; Suter v. Jordan Marsh Co., 225 Mass. 34, 113 N.E. 580; Kimball v. Cotting, 234 Mass. 172, 125 N.E. 551; Id., 229 Mass. 541, 118 S.E. 866, L.R.A. 1918C, 1189; Welch v. Phillips, 224 Mass. 267, 112 N.E. 651; North Pennsylvania R. Co. v. Philadelphia & R. Ry. Co., 249 Pa. 326, 95 A. 100; Philadelphia C. P. Ry. Co. v. Philadelphia R. T. Co., 263 Pa. 561, 107 A. 329; Philadelphia G. & N. R. Co. v. Philadelphia & R. Ry. Co., 265 Pa. 325, 108 A. 528; Ehrlich v. Brogan, 262 Pa. 362, 105 A. 511; Van Beil v. Brogan, 65 Pa.Super. 384; European & North American Ry. v. Maine Cent. R. Co., 135 Me. 338, 196 A. 642; Republic Building v. Gaertner, 201 Ky. 509, 256 S.W. 1111, 30 A.L.R. 982; National Bk. of Kentucky v. Minary, 221 Ky. 798, 299 S.W. 985; Whitlock v. Boston & M. R. R., 1 Cir., 29 F.2d 351; Schlafly v. D'Arcy, 8 Cir., 1 F.2d 297; Helvering, Com'r, v. Wheeling, etc., Co., 4 Cir., 71 F.2d 749; Tevander v. Ruysdael, 7 Cir., 299 F. 746, 747(6, 7); Thomas v. Cincinnati, N. O. & T. P. Ry. Co., C.C., 93 F. 587.

[13] Ga.Code (1933), Sec. 20-702; City of Orlando v. Murphy, 5 Cir., 84 F.2d 531(2).

[14] Ga.Code, Sec. 20-704; Cocke v. Vacuum Oil Company, 5 Cir., 63 F.2d 406(5).

[15] Old Colony Tr. Co. v. Omaha, 230 U. S. 100, 101, 118, 33 S.Ct. 967, 57 L.Ed. 1410; Franklinville Realty Co. v. Arnold Const. Co., 5 Cir., 120 F.2d 144, 145 (4), 148; Candler, Inc., v. Georgia Theater Co., 148 Ga. 188, 192, 96 S.E. 226, L. R.A.1918F, 389; Restatement of the Law (Contracts), Sec. 235(e).

■ Let us examine the words of the tax covenant first. If they are clear and certain in their meaning and impose the burden on the lessor, there is no place for construction. Where the sun is shining there is no need of light. On first impression "all federal taxes * * * ordinary or extraordinary * · * * thereafter to be lawfully imposed upon the lessor * * * under * * * the Constitution and laws of the United States" would seem to include federal income taxes. They are federal taxes, they were thereafter lawfully imposed, they are a tax upon the lessor, and they are imposed under the Constitution and laws of the United States. Is the mere fact that the constitution had to be amended before income taxes could be lawfully imposed by the United States a sufficient reason to refuse to give the quoted words their usual and common significations?[16] I do not think so. A tax is thereafter lawfully imposed whether levied under a power already conferred, or granted later by amendment, on the Congress by the Constitution. Obviously some federal taxes were in the contemplation of the parties, or they would not have mentioned them, and they included in express words as a liability of the lessee not only taxes "then resting", but those "thereafter to be lawfully imposed", upon the lessor. What kind of federal taxes were the parties considering when the lease was drawn up if not income taxes? Can the words used be fairly construed to mean only franchise taxes, or some other tax that is related only to the operation, as distinguished from the ownership, of a railroad? If so, why was it not so stated or why were they not enumerated instead of saying "all" federal taxes imposed upon the lessor? The very fact they were not gives support to the view that the parties did not want to restrict or cut down the general and all-inclusive language they employed, as by enumeration they might have done on the doctrine of expressio unius etc. In 1895 the stereotyped "including without limiting the generality of the foregoing the following" clause, now in common use, and which might have been used to avoid the doctrine, had not been developed and was not so familiar.

■■ If the meaning of the tax covenant is obscure then ambiguity exists; and I reach the same conclusion when the circumstances surrounding the parties are reviewed. In 1895 the lease was valuable. Otherwise the plan of reorganization of the original lessor would have contained no provision for taking over leaseholds. The reorganized company did not have to take them over. Some modification was necessary as the lessee was a newly created corporation. The lessor did not have to agree to a modified lease. Hence, the negotiations between the parties. At the outset of these negotiations the lessor had the reorganization plan before its directors, and they authorized their president to execute a new lease but directed that certain new provisions be included in it, among others, that the arrears of rentals to be paid be recalculated at 5% net on the capital stock instead of 7%, future rentals at 5%, a change in the term, payment by the lessee of (a) certain salaries of officers of lessor and (b) all taxes etc. then due or thereafter payable by lessor "as a direct or an income tax". The directors unquestionably then had future income taxes in contemplation. But the lease as finally drafted, authorized and executed departed from this language. Why? A more reasonable conclusion is not that the parties agreed future federal income taxes, if any were thereafter lawfully imposed, should be borne by lessor— which would mean that the directors receded from the position first taken by them —but that it was thought wiser to use general and comprehensive instead of specific and restricted language in the tax covenant. There is no dispute now about the fact that the state "income tax" (one-half of one per cent of its annual income) payable by lessor under the 1895 lease is to be borne by lessee. The later federal income tax is of the same nature, except it is not in lieu of any ad valorem tax. If it had been the intention of the parties, guided by able lawyers as they were, to put the burden of the one on one party and of the other on the other, I think they would have said so. By the new or modified lease the fixed annual rental was being substantially reduced. As an off-set, the salaries of certain officers of the lessor (up to $2,000 per annum) and all taxes, ordinary or extraordinary, were to be paid by the lessee. Pollock v. Farmers' Loan & Trust Co., supra, was fresh in the minds of everybody. Would a prudent lessor have been willing to give up so much and take all the chances of future tax levies upon income? Prosperous operation of the leased line in the

---

[16] Ga.Code, Sec. 20-704(2).

future, as it turned out to be, went to the benefit of the lessee. The lessor did not share in that prosperity. The only risk the lessee took was that the earnings might not equal the fixed rentals, plus the maintenance, salaries mentioned and taxes of all kinds levied on the lessor and its property. This risk, I believe, would not then have been considered great. The lessor was practically selling its property by the lease it gave. The lessee acquired an interest in the property.[17] "The value of property consists in its use, and he who owns the use forever, though it be on condition subsequent, is the true owner of the property for the time being".[18] It has been held in some tax cases that the general rule of the landlord's liability for taxes has no application to a perpetual lease and for the purposes of taxation the mere legal title remaining in the land owner will be disregarded.[19] Income taxes were not under consideration in the cases cited, and I mention them merely as showing that the ordinary relation of landlord and tenant does not exist here, and the principles of law usually applicable to that relationship, and tax liabilities growing out of it, are not to be applied with the same strictness, and the same presumptions do not arise in favor of the tenant, in this case.

Our range of vision must encompass 101 years and what the parties had in contemplation for that long period of time. A narrower view of the intention of the parties does violence to their engagements. For that length of time the lessee took the chances of an amendment of the Constitution of the United States like the Sixteenth, just as it took the risk of an amendment of the Georgia Constitution, for example, with respect to creating new counties. If a new county had been created under a constitutional amendment ratified since 1895 from territory through which this leased railroad runs,[20] with subsequent tax levies by that county, it would hardly be contended here that such a county tax levy could be escaped by the lessee for that reason alone.

It is not necessary to hold that the lessee is required to pay the taxes on accumulated property purchased by the lessor with its rent money, or the taxes on income arising therefrom, for in a case of this kind some qualification should be placed on the words used. Taking into consideration the rule that if the construction be doubtful the preference shall be given to that which goes most strongly against the party assuming the obligation, it seems to me the intention of the parties here was to indemnify the lessor against subtraction from the rentals wherever found and identifiable through taxation of any kind so as to reduce the amount available for dividends to stockholders to a sum less than 5% annually during the term of the lease. That seems to me to be the kind of "deduction" the parties must have had in mind when the tax covenant was framed, particularly in that part of it referred to by counsel as the "intention paragraph".[21] It is different after the stockholders get their dividends. They then meet their own respective income tax obligations. It is also different if instead of paying dividends the lessor accumulates and invests the rental money.

If the conclusions reached require fortification I find it in the practical construction the original parties themselves placed upon the contract. For 19 years the obligation was admitted by the lessee, and for 8 years by its equity receiver. "There is no surer way to find out what parties meant, than to see what they have done".[22] No question was ever raised as to the liability of the lessee for federal income taxes until the decision in United States v. Warren, supra (note 11), in the Second Circuit in April, 1942.[23] Though the trustee in reorganization may not be bound by what the

[17] Wright v. Central of Georgia Ry. Co., 146 Ga. 406, 410, 91 S.E. 471, reversed on other grounds 248 U.S. 525, 39 S.Ct. 181, 63 L.Ed. 401, cited in note 4.

[18] Bleckley, C. J., in Wells v. Savannah, 87 Ga. 397, 399, 13 S.E. 442, affirmed 181 U.S. 531, 544, 21 S.Ct. 697, 45 L.Ed. 986.

[19] Norfolk v. Perry Co., 108 Va. 28, 61 S.E. 867, 35 L.R.A.,N.S., 167, 128 Am. St.Rep. 940, cited in Perry Co. v. Norfolk, 220 U.S. 472, at page 479, 31 S.Ct. 465, 55 L.Ed. 548.

[20] As Jenkins county, Georgia, was. See Georgia Laws 1904, p. 47, 1905, p. 57.

[21] This paragraph is quoted in full earlier in this opinion.

[22] Insurance Company v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410; See, also, 17 C.J.S., Contracts, § 325, note 20; 12 Am.Jur., Sec. 249; and cases cited in note 15.

[23] The language used in the lease under consideration is distinguishable from

lessee and its receiver have done, this does not mean that if the words of the lease are of doubtful import the conduct of the parties should be ignored. On the contrary, as an aid to interpretation, the construction by the parties should be given great, often controlling, weight.

 There remains for determination only the question of interest on the arrears of rentals unpaid at the time the lease was adopted by the trustee in reorganization. He argues that until adoption the obligation was not a liquidated demand bearing interest under the law of Georgia.[24] According to the general view, rent which is certain and payable on a day certain (here on January and July 1st of each year) and is not paid will bear interest therefrom at the rate imposed by law if the contract is silent as to the rate.[25] The trustee's adoption of the lease relates back to the beginning of the proceeding, and he must from the beginning conform to the terms of the contract he has assumed.[26] Insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed. The equities require interest also because the operations of the leased line have been quite profitable and the lessee's creditors get the benefits arising.[27] Interest should be allowed.

Let an order be presented.

United States v. Warren in that "taxes imposed upon the lessor" is more comprehensive language than "taxes which may be imposed * * * on the said party of the first part a corporation" because, as pointed out by Judge Augustus Hand in that case, income taxes are not imposed upon the lessors because they are corporations. I am unable, however, to follow all of the reasoning of Judge Hand in construing the Syracuse lease, particularly where he holds [127 F.2d 137] "taxes on the "income or profits of the business' " necessarily meant the business of the lessee who ran the railroad and could not relate to the business of the lessor which collected the rent and disbursed it to its stockholders. Judge Hand's conclusions may have been controlled in large measure by the decisions of New York State courts. He said "The reasoning of the District Court might be a sufficient basis for upholding the judgments [which was reversed], if the interpretation of the clauses in the leases * * * were to be regarded as an entirely new and unsettled problem. But the decisions of the New York and of other courts preclude such an interpretation". 127 F.2d 136. The value of this case as a precedent is impaired by the fact that on the handing down of the mandate, the Court said: "The decision of this Court is not res adjudicata as between the three lessor railroad companies and their lessee, the Delaware, Lackawanna and Western Railroad Company, on the question of whether or not The Delaware, Lackawanna and Western Railroad Company is obligated to bear and pay income taxes of such lessors, or on the rights of such lessors hereafter to litigate that question".

25 32 Am.Jur., Sec. 433; 36 C.J., Sec. 1361; Parker v. Gortatowsky, 129 Ga. 623(4), 59 S.E. 286.

26 Palmer v. Palmer, 2 Cir., 104 F.2d 161(2), 163; Westinghouse Elec. & Mfg. Co. v. Brooklyn R. T. Co., 2 Cir., 6 F.2d 547, 548(6), 549.

27 Reconstruction Finance Corp. v. Pelts, 7 Cir., 123 F.2d 503, 504(3), 505.