## In re CENTRAL OF GEORGIA RY. CO.

### No. 4829.

District Court, S. D. Georgia,
Savannah Division.

Jan. 25, 1945.

Adams, Douglas & Brennan, of Savannah, Ga., for Citizens & Southern Nat. Bank, trustee of Chattanooga Division Mortgage of Central of Georgia Ry. Co.

T. M. Cunningham and George O'Donnell, both of Savannah, Ga., for Merrel P. Callaway, and Central of Georgia Ry. Co.

Francis T. P. Plimpton (Debovoise, Stevenson, Plimpton & Page), of New York City, and R. Basil Morris (Hitch, Morris & Harrison), of Savannah, Ga., for Liberty National Bank & Trust Co., trustee First Mortgage Central of Georgia Ry. Co.

Edwards W. Bourne (Alexander & Green), of New York City, and Luthur H. Zeigler (McLaws, Brennan & Zeigler), of Savannah, Ga., for Bankers Trust Co., trustee Consolidated Mortgage of Central of Georgia Ry. Co.

Alexander M. Lewis (Rathborn Perry, Kelley & Drye), of New York City, and Henry M. Dunn (Anderson, Cann & Dunn), of Savannah, Ga., for Central Hanover Bank & Trust Co., trustee for Chattanooga, Rome & Southern Mortgage, and trustee for Second Preference Income Mortgage of Central of Georgia Ry. Co.

Robert M. Becket (Wright, Gordon, Zachry, Parlin & Cahill), of New York City, and W. M. Fulcher (Lee, Congdon & Fulcher), of Augusta, Ga., for Chemical Bank & Trust Co., trustee Refunding and General Mortgage of Central of Georgia Ry. Co.

Frank M. Oliver (Oliver, Oliver & Davis), of Savannah, Ga., for Manufacturers Trust Co., trustee First Preference Income Mortgage Central of Georgia Ry. Co.

R. Basil Morris (Hitch, Morris & Harrison), of Savannah, Ga., for Liberty Na-

tional Bank & Trust Co., trustee of Third Preference Income Mortgage Central of Georgia Ry. Co.

LOVETT, District Judge.

The Central of Georgia Railway Company, hereinafter usually referred to as the "debtor," in 1901 acquired by purchase from the Chattanooga, Rome & Southern Railroad Company its line of railway, together with all of its assets, rights, franchises, etc. The C. R. & S. then went out of business. The purchase was made and the property conveyed subject to an underlying mortgage of the C. R. & S. thereon dated July 1, 1897, which provided for an issue of $500,000 principal amount of 5% First Mortgage Bonds due July 1, 1947, the conveyance reciting "only $343,000 and the coupons thereon have been negotiated and are now outstanding". There was no express assumption of the mortgage debt by the Central. All of the $500,000 of bonds were duly authenticated by the trustee under the mortgage, and $343,000 principal amount of them were negotiated and sold and are now held by the public. The remaining $157,000, with interest paid or payable thereon, are the subject of this controversy.

The whole issue of $500,000 C. R. & S. bonds was delivered by the mortgagor to Simon Borg & Co., of New York, either as agents or reorganization managers of the Chattanooga, Rome & Columbus Railroad Company (a predecessor railroad) to be used as far as necessary in the purchase by the C. R. & S. R. R. Co. of the line of railway of that railroad then being sold under foreclosure, which, as stated above, was later conveyed to the debtor. These bonds, when issued pursuant to vote of the Board of Directors of the C. R. & S. were to be used "in part payment of the agreed purchase price of (the C. R. & C. railroad), and other legitimate purposes of said railroad company, any unexpended balance of said bonds or the proceeds thereof to be used only for the purposes of said Railroad Company." Only $343,000 principal amount were used to pay for the C. R. & C. lines of railway, and the balance of $157,000 was retained and held by Borg, along with other collateral, as security for a debt of $200,000 owing to him by the C. R. & S.

To finance its purchase of the C. R. & S. line of railway and its assets the debtor on June 1, 1901 executed what is known as its Chattanooga Division purchase money mortgage, the line of railway having become a part of that division. It provided for the issue of $2,400,000 principal amount 4% bonds to become due June 1, 1951, to be used as follows: $1,650,000 to pay for the C. R. & S. property and to discharge a debt of the C. R. & S. Co. and the redemption of the bonds and stock securing same, $190,000 for immediate and $217,000 for future betterments, and $343,000 to take up that amount of C. R. & S. bonds in the hands of the public. Only $2,057,000 were issued, the $343,000 of underlying bonds never having been exchanged. Of the $1,650,000 bonds, $1,300,000 was used to pay for the line of railway purchased and $350,000 to pay Borg's debt. Though certain agreements with Borg made by debtor in February 1901 provided that this $157,000 of bonds when acquired by debtor should be used also for betterments, they were not so used, and when the divisional mortgage was later drafted it made no express provision for acquiring the $157,000 of underlying bonds from the proceeds. However, on the payment of Borg's debt they were surrendered to the trustee of the Chattanooga division mortgage. It may be that the use of $350,000 allocated to the discharge of the C. R. & S. debt was intended to operate to release and transfer these underlying bonds to the Central. That probably was the intention as bonds and stock of another short line of railway now a part of the division were held by Borg, along with the underlying C. R. & S. bonds mentioned, as collateral security for his $200,000 debt, and no doubt these bonds were used by the Central in paying for that other short line. Nevertheless, the trustee under the divisional mortgage obtained possession through delivery by Borg to it, at the direction of the debtor, of the $157,000 of underlying bonds at or about the time the divisional mortgage was made, Borg saying in a letter transmitting them, with other collateral, "retain (the bonds) as additional security" for the divisional bonds "as provided in the deed of trust." The direction of the debtor to the mortgage trustee was to hold the bonds "in escrow." They were not conveyed in the granting clause of the deed of trust with the lines of railway as security, but were referred to only in the habendum clause of the mortgage, as follows: "This mortgage is subject, only as to that part of said property lying between Chattanooga, Tennessee, and

Carrollton, Georgia, to a prior mortgage given by Chattanooga, Rome and Southern Railroad Company to the Union Trust Company of New York, bearing date July 1, 1897, to secure an issue of bonds maturing fifty years after the date thereof, aggregating $500,000 and interest, of which only $343,000 and the coupons thereon have been negotiated and are now outstanding *($157,000 thereof, and the coupons thereon, having been surrendered to the Trustee hereunder, to be held as additional and further security for this issue of bonds as hereinafter provided)*." There was no further or "hereinafter" clause again expressly mentioning the $157,000 of underlying bonds. There are detailed provisions thereafter in the deed of trust for retaining $343,000 of divisional bonds by the trustee to take up bond for bond, as and when presented for exchange, a like amount of the underlying bonds, holding them when acquired and deposited uncancelled as additional security, and "whenever all of said bonds and coupons shall have been deposited the same shall be cancelled and the lien of the mortgage satisfied and discharged of record."

The Central of Georgia Railway Company's affairs and assets were placed in equity receivership in this court in December 1932, and there remained until succeeded by this proceeding under Sec. 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, in 1940. The interest coupons on the divisional bonds, as well as the interest coupons on the $343,000 of underlying bonds, were paid by the railway company as they became due until the equity receivership intervened. No attempt, however was made to collect the interest coupons, 1 to 70, becoming due January 1, 1898, through July 1, 1932, on the $157,000 of underlying bonds, and, if owing, they are still unpaid. They amount to $274,750. During the equity receivership and these proceedings, under appropriate orders of this court, interest coupons aggregating $86,350 and becoming due since July 1, 1932, on the $157,000 of C. R. & S. bonds have been paid.[1]

The successor trustee under the Chattanooga Division Mortgage has filed its petition asking that this court declare that it is the bona fide holder for value of the $157,000 of underlying bonds with all unpaid interest coupons and that interest coupons 1 to 70, becoming due before December 1932, are secured by the underlying C. R. & S. mortgage and are entitled to priority of payment over the $343,000 of like bonds or the interest thereon.

The trustees under the C. R. & S. underlying mortgage, the First Mortgage, the Consolidated Mortgage and the Refunding and General mortgage of the debtor, as well as debtor's trustee, have filed answers opposing the petition, saying that no interest was payable or collectible on the $157,000 of underlying bonds so long as interest was paid on the divisional bonds which they secured. The mortgage trustees go further and say that the $157,000 of bonds were never a valid obligation of the C. R. & S. R.R. Co., were never legally pledged under the divisional mortgage and that the $86,350 paid as interest thereon maturing since July 1, 1932 was, therefore, paid through mistake and that this court should now enter an order to enforce and protect the rights of the bondholders they represent arising out of such improper payment. Debtor's trustee does not go that far. Laches and Georgia statutes of limitations are also pleaded.

■ I find myself in agreement with the mortgage trustees and debtor's trustee that the interest coupons maturing before December 1932 are uncollectible. Assuming they were valid obligations of the C. R. & S. R.R. Co., and were legally pledged as collateral security under the Chattanooga divisional mortgage of the debtor, the payment of all interest up to December 1, 1932 on the divisional bonds, for the payment of which bonds the underlying interest coupons were held only as collateral security, operated to extinguish the debt represented by those interest coupons. From 1901 to December 1932 holders of the Chattanooga divisional bonds received all that was due and payable under the divisional bonds. If the debtor had paid eo nomine the interest each year on the underlying bonds held as collateral, the amounts so paid would have been credited on the larger interest coupons of the divisional bonds, and a correspondingly lesser payment then would have been made to satisfy that in-

---

[1] On December 19, 1944, since the petition in this case was filed, $82,280 additional has been paid to the mortgage trustee of the divisional bonds, under an order of this court (Document No. 374), to be held by it pending this decision, and the debtor's trustee was also directed to hold in abeyance and suspense $11,775 to be paid in respect of the $157,000 of underlying bonds.

terest. No one has been injured by the failure to call some portion of the interest paid currently interest on the underlying bonds, or by the failure to require the surrender of the coupons on them as and when extinguished.

If the underlying bonds had been the direct and primary obligation of the debtor, clearly the payment of interest on the debt they were pledged to secure would have discharged the debtor from liability for interest on the collateral security, since there was no consideration received by debtor except the debt on which the agreed interest had been paid. Worth v. Marshall Field & Company, 4 Cir., 240 F. 395(2), 397. To all intents and purposes, the debtor had become the obligor as the successor of the C. R. & S. It had acquired all of its assets, rights and franchises. The C. R. & S. had been liquidated. The debtor had assumed its current liabilities. The only person to whom a holder of C. R. & S. bonds could look for the payment of his interest or the principal of his bonds was the debtor. To prevent a default on the underlying mortgage and a sale on foreclosure of the line of railway the debtor had to provide for the payment of the interest on these bonds. As I have said, if the interest had been collected currently on the $157,000 of underlying bonds, it would have been credited on the interest due on the Chattanooga divisional bonds for which they were held as collateral security. When the greater sum—the interest on $2,057,000 as against the interest on $157,000—was currently paid it automatically wiped out the lesser sum becoming currently due. If this were not so and interest had been currently collected on both, the trustee under the divisional bond mortgage would have been required to set up a reserve or anticipate payment of some of the divisional bonds, and the deed of trust makes no provision for either contingency.

■ This was the practical construction of the parties as to their intention. For more than thirty years, 1901 to 1932, the mortgage trustee under the Chattanooga Divisional mortgage acquiesced in that construction. It is too late now for the suc-cessor trustee to say that this was wrong. In effect, all of the parties affected said as long as no default exists under the divisional mortgage, none of the coupons on the collateral shall be collectible. As put by the Supreme Court of the United States, "There is no surer way to find out what parties meant, than to see what they have done."[2] This rule of construction is also applied in New York, the state where the divisional mortgage was executed and where the bonds issued thereunder were payable.[3] The laws of that state should govern the construction if there be ambiguity in the contract or conflict of decisions on the subject.[4]

■ The fact that interest maturing before December 1932 was not collectible on the coupons, however, does not mean that the bonds themselves were invalid. They were not invalid. On the other hand, they did not have the general validity or independent status of the $343,000 of outstanding bonds: Their validity was limited to the purpose of securing the indebtedness: first to Borg, then to the trustee of the divisional mortgage.

The status of bonds pledged as security for a loan and then returned to the mortgagor is explained in Westinghouse Electric & Manufacturing Co. v. Brooklyn Rapid Transit Co., S.D.N.Y. 1923, 288 F. 221, 236, where, quoting the Special Master with approval, the court said:

"As to the status of authenticated and delivered bonds, which have not been sold outright, but have been merely deposited as collateral to secure some other and independent indebtedness of the corporation the conclusion is reached that when, because of the payment of such independent indebtedness, they are returned to the corporation without having been used to make good default in such payment, they return to their original status—having served their temporary purpose—as bonds authenticated and delivered by the trustee, but not issued. They might be issued as any other bond, therefore, unissued, might be issued; but until issued again they remain as they were before their first issue."[5]

[2] Brooklyn Life Insurance Company v. Dutcher, 95 U.S. 269, 273, 24 L.Ed. 410. See also In re Central of Georgia Ry. Co., D.C., 47 F.Supp. 786(4) (11), 791, 793, and cases cited.

[3] Brooklyn Public Library v. City of New York, 250 N.Y. 495, 501, 166 N.E. 179.

[4] Restatement, Conflict of Laws, Sec. 346.

[5] Contrary authority in Security Savings Bank v. St. Louis Chemical Co., 1912, 172 Mich. 74, 137 N.W. 807, 808 " * * * neither reason nor precedent supported the proposition that 'officers of a new corpora-

Though the debtor in the instant case never gained actual physical possession of the $157,000 of bonds when the indebtedness to Borg was retired and though the debtor had not itself issued the bonds in the first place, still, since the debtor assumed the current obligations of the issuing railroad and since the debtor directed the released bonds to be placed or "surrendered" in "escrow" as security for the divisional mortgage, it may be considered that the debtor itself reissued the bonds—but again for a limited purpose. Though limited, the bonds were valid, and when insolvency occurred, both the divisional and the underlying were in default. Interest then became collectible on the underlying bonds but then again—as before—when collected, it could only be credited on the divisional bonds.

■ Since the debtor's insolvency in 1932, twenty-two coupons of the $157,000 of underlying bonds, amounting to $86,350, have been paid by order of court. Though those orders were made without· the complete knowledge of the history of the mortgages herein set out I do not feel the payments should now be recaptured. The payments were properly made for the reason that, differing from the situation before December 1932, interest on the divisional bonds was not being currently paid. The payments have been credited on the Chattanooga Division bonds, and the Chattanooga Division during the period of receivership and trusteeship has earned more than that sum and, if all earnings were distributed, would be entitled, in its own right, to interest payments greater than those which it has now received through the backhanded method of payments on the C. R. & S. bonds. It would be inequitable to retrieve these payments, which have been credited to the proper source, merely because they were made in an indirect manner.

My conclusions are that the prayers of the Trustee of the Chattanooga Division Purchase Money Mortgage should be denied; and that the second and third prayers of the other Mortgage Trustees, contained in their joint answer, should likewise be denied.

In view of what has been determined it seems unnecessary to consider the questions raised by the pleas of laches and the statutes of limitations, or to carefully weigh the effect a different conclusion touching the payment of the older interest coupons or the recapture of the amounts paid on the later coupons might have on the debtor's plan of reorganization now before the Interstate Commerce Commission.

Let an order be presented by counsel for the debtor's trustee in accordance with this opinion; and let a further order also be presented supplementing the order of December 19, 1944 (Document No. 374) disposing of the matters therein directed to be held in abeyance pending this decision.

---

tion can give validity to unissued bonds of another corporation, even though it succeeded to all its assets and was bound to pay all its debts'. * * *

"(The new corporation) might have made a new and second mortgage of corporate property to secure a new issue of bonds, but could not deprive the holders of bonds secured by the first mortgage of their prior lien."

It should be noted that in this case apparently decisive consideration was given to the security of the prior lien holder.

In the instant case the parties themselves, as is explained above, took such action as they could to secure the prior lienholders. In the instant case, however, the security of the prior holders is not made inviolate as it was in the Michigan case for, since the underlying bonds are considered valid, they could have been sold if there had been a default on the divisional mortgage other than in insolvency. Thus, to that extent, the security of the outstanding bondholders is limited.