The INDIANAPOLIS UNION RAILWAY COMPANY, Plaintiff-Appellee,

v.

The BALTIMORE AND OHIO RAILROAD COMPANY, Norfolk and Western Railway Company and Illinois Central Gulf Railroad Company, Defendants-Appellants.

Nos. 77–1356, 77–1357 and 77–1358.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1977.

Decided Jan. 13, 1978.

William F. Welch, Daniel P. Byron, Indianapolis, Ind., Albert W. Laisy, Cleveland, Ohio, Cassett Martz, Gustav H. Dongus, Indianapolis, Ind., for defendants-appellants.

Edward B. Raub, Jr., R. Stanley Lawton, Karl J. Stipher, Carl T. Reis, Indianapolis, Ind., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, WOOD, Circuit Judge and ESCHBACH, District Judge.*

PER CURIAM.

At issue in these three consolidated appeals is the power of the Indianapolis Union Railway's Board of Managers to alter, by less than a unanimous vote, the allocation of expenses and charges among users of the railroad. The Indianapolis Union was formed in 1883 by five larger railroads which used its tracks in central Indianapolis. Its operating expenses are apportioned and are covered by charges for the use of the railroad and by rent allocated among the five member railroads by the governing agreements signed in 1883 and 1930. Each member's representation on the board is proportionate to the fixed percentage of rent it pays. As a result of a merger in 1968, the Penn Central Transportation Company (now Conrail) dominates the board.

In 1973, the board adopted the three resolutions challenged here. All three greatly reduce the usage fees chargeable to Penn Central and increase costs for other users of the Indianapolis Union. In opposition to the particular changes that work to their own detriment, the defendants-appellants each argue that the 1883 and 1930 agreements require that any reallocation of expenses and usage charges be effected by a unanimous vote. Two of the appellants also rely on a 1925 opinion of this court construing the 1883 document.

In a careful and well-reasoned opinion entered December 16, 1976, the district court held that a majority of the board can revise usage charges and fees in response to major changes in the types of traffic using the Indianapolis Union's facilities. Express language in Paragraph Twelfth of the 1883 agreement provides that the terms and conditions of the use of the railroad are to be determined by the board. "Moreover," the district court concluded, "because the grant from the original owner railroads was in perpetuity, it was necessarily contemplated by the parties to the Operating Agreement that changes would have to be made by the Board of Managers to meet unforeseen or changing conditions in the railroad industry." Conclusion of Law No. 49.

The findings of fact of the district court are not clearly erroneous and the conclusions of law are correct.

Accordingly, we AFFIRM the district court's judgment and adopt the opinion of the district court entered December 16, 1976.

Inasmuch as the district court's December 16, 1976 preliminary decision and February 4, 1977 findings and conclusions are unpublished, a copy thereof is attached to this opinion as an appendix.

APPENDIX

_____

PRELIMINARY ANNOUNCEMENT
OF DECISION

December 16, 1976

The Court having considered the evidence together with the briefs of the parties and their oral arguments takes this means to preliminarily announce its general findings and conclusions, having in mind that counsel for the successful parties will be directed to prepare more specific proposed findings of fact and conclusions of law not inconsistent with this preliminary announcement, together with a tendered final judgment entry. This announcement is not to be construed as a final order.

* Chief Judge Jesse E. Eschbach of the Northern District of Indiana is sitting by designation.

### The Plaintiff's Action

While the plaintiff's action in this case is a suit on a contract, the principal dispositive issue for the Court to decide is whether the resolutions of September 5, 1973, and December 6, 1973, are valid and legally binding on the tenant railroads of the Indianapolis Union Railway Company. This requires an interpretation of the 1883 Operating Agreement. The Court, after carefully considering the evidence and the applicable law as submitted and argued by the parties has concluded that the resolutions are valid and legally binding by reason of the authority vested in the Board of Managers under Paragraph Twelfth of the Agreement. Further, the Court has concluded that the resolutions are in conformity with the provisions of Paragraph Eighth of the Agreement. Paragraph Eighth provides that the charges to the tenant railroads are to be apportioned among them on the basis of wheelage in proportion to their use of the tracks of the Union Railway Company and Belt Railroad. The Court concludes that there was no departure from the requirements of the Operating Agreement that the apportionment of the expenses for the use of the tracks be made on the basis of wheelage.

The Court finds and concludes that the adoption of the resolutions did not require a unanimous vote of the Board of Managers. The exercise of power delegated to the Board of Managers under and pursuant to Paragraph Twelfth does not require a unanimous vote of the Board to prescribe the terms and conditions upon which the Belt Railway and Union Railway property may be used in common by the tenant railroads.

The Court finds and concludes from the evidence in this case that the doctrine of practical construction did not preclude the Board of Managers from altering the method of allocating the expenses enumerated in Paragraph Eighth among the tenant roads. The Court concludes that *Illinois Central Railroad Co. v. Indianapolis Union Railway Co.,* 6 F.2d 830 (7th Cir. 1925), is distinguishable from the case at hand. In that case the plaintiff railroad, the Illinois Central, alleged that a billing practice of the Indianapolis Union Railway Company was contrary to Paragraph Eighth of the Operating Agreement. The Seventh Circuit in ruling for the defendant held that the doctrine of practical construction precluded the plaintiff from challenging the billing practice. In its decision the Court stressed the fact that the Illinois Central became a tenant road in 1906, long after the billing practice in question was initiated. This practice continued without question for yet another decade after the Illinois Central's admission. At the time it became a tenant in 1906, Illinois Central agreed to be bound by the customs and practices of the Railway then in effect.

*Illinois Central* does not prohibit the Board of Managers from changing a billing practice of long standing. It merely held that plaintiff railroad could not challenge, as being contrary to the Agreement, a practice long in effect.

### The Counterclaim of Illinois Central Gulf Railroad Company

The Court finds and concludes that the Illinois Central Gulf Railroad Company is not entitled to a ruling in its favor on its counterclaim for declaratory and injunctive relief.

The Court finds and concludes that the Operating Agreement does not forbid the use of Union tracks for through freight traffic. Paragraph Eighth provides that the Union Railway Company's tracks "shall be used exclusively, *as far as possible*, for passenger train services and such local freight deliveries as may be necessary in consequence of location of freight houses and private sidings; all other freight transfers and deliveries shall be made over the Belt Railway." [Emphasis added.]

The Agreement merely provides that the Union tracks shall be reserved for passenger and industry traffic "as far as possible." Inasmuch as the use of Union tracks for passenger and industry traffic had practically ceased and the Belt Railway had become so congested as to render it impracti-

cal to rely on the Belt Railway for through freight movements without the use of the Union tracks, this Court cannot substitute its judgment for that of the Board in allowing continued use of the Union tracks for through freight traffic. Nor can the Court say that under current conditions this use of the Union tracks is contrary to Paragraph Eight of the Operating Agreement.

The Court recognizes that the elimination of the $0.25 assessment works to the financial benefit of the users of the Union tracks for through freight traffic and to the financial detriment of the nonusers of the Union tracks for through freight traffic who pay the wheelage charges for the use of the Belt tracks. However, for the Court to rule that the $0.25 assessment should be reinstated effective as of June 1, 1973, and credited to the Belt expenses would require the Court in framing a decree to engage in impermissible speculation.

The Court concludes that the Board of Managers had the power and authority under Paragraph Twelfth of the Operating Agreement to eliminate the $0.25 per car and engine mile assessment.

Thus, by reason of the foregoing the Court finds for the plaintiff, The Indianapolis Union Railway Company, and against the defendant Norfolk and Western Railway Company on Counts I and II of the complaint, and for the plaintiff, The Indianapolis Union Railway Company, and against defendant The Baltimore & Ohio Railroad Company on Counts III and IV of the complaint.

Inasmuch as Counts V through VIII of the complaint are in the alternative, the Court need not rule on said counts by reason of the Court's rulings on Counts I through IV of the complaint.

The counterclaim of The Baltimore & Ohio Railroad Company is denied by reason of the Court's rulings in favor of The Indianapolis Union Railway Company and against The Baltimore & Ohio Railroad Company on Counts III and IV of the complaint.

The counterclaim of the Illinois Central Gulf Railroad Company is denied for the reasons stated in the Court's Preliminary Announcement of Decision.

The counterclaim of Penn Central Transportation Company is granted, with the relief sought to be in accord with the Court's rulings on Counts I through IV of the plaintiff's complaint.

The counterclaim of the Louisville & Nashville Railroad Company is granted, with the relief sought to be in accord with the Court's rulings on Counts I through IV of the plaintiff's complaint.

/s/ WILLIAM E. STECKLER

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
Southern District of Indiana
Indianapolis Division

* * (Caption—Cause No. IP 74–312—C) * *

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and this Court's Preliminary Announcement of Decision, entered December 16, 1976, the Court makes the following findings of fact and conclusions of law. To the extent any finding of fact shall have been herein denominated a conclusion of law, it shall be deemed a finding of fact; to the extent any conclusion of law shall have been herein denominated a finding of fact, it shall be deemed a conclusion of law.

### FINDINGS OF FACT

#### I. *Parties*

1. Plaintiff, The Indianapolis Union Railway Company (hereinafter "I.U. Railway"), is an Indiana corporation with its principal place of business in Indianapolis, Marion County, Indiana. I.U. Railway is a common carrier by railroad, performing switching and transfer services in Marion County.

2. Defendant Norfolk and Western Railway Company (hereinafter "N & W") is a Virginia corporation with its principal place

of business in the State of Virginia. Defendant-counterclaimant The Baltimore and Ohio Railroad Company (hereinafter "B & O") is a Maryland corporation with its principal place of business in the State of Maryland. Defendant-counterclaimants Robert W. Blanchette, Richard C. Bond and John McArthur are trustees of the property of Penn Central Transportation Company (hereinafter "Penn Central"). Defendant-counterclaimants Louisville & Nashville Railroad Company (hereinafter "L & N") and Illinois Central Gulf Railroad Company (hereinafter "I.C.G.") each are incorporated in and have their principal places of business in states other than the State of Indiana. Defendant Albert B. Huttig is a citizen of the State of Illinois and is trustee of the property of the Cleveland, Cincinnati, Chicago & St. Louis Railway Company.

3. N & W, B & O, Penn Central, L & N, and I.C.G. (hereinafter referred to collectively, along with their predecessors in interest, as "the tenant railroads") all operate as common carriers by railroad. One or more of the rail lines of each of the tenant railroads connects with the lines of I.U. Railway in Marion County, Indiana.

4. On April 1, 1976, Penn Central was succeeded as an operating railroad by the Consolidated Rail Corporation (Conrail) pursuant to Title III of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 741 *et seq.* Conrail entered an appearance at the outset of the trial and was represented by counsel throughout the trial. Because all of the events critical to this case occurred prior to Conrail's takeover, the railroad now known as Conrail will be referred to throughout these findings by its former name "Penn Central." .

## II. *Present Operations of I.U. Railway*

5. The operations of the I.U. Railway fall into three general categories:

(1) Operations over "the belt railway," a 14.73 mile length of track forming a loop around the central portion of the city of Indianapolis to the east, south and west;

(2) Operations over "union tracks," a 1.5 mile length of straight track in the center of Indianapolis leading to and from union station; and

(3) Operation of union station, the Indianapolis rail passenger terminal, which is located on union tracks in downtown Indianapolis.

6. Access to union tracks and union station is via the rail lines of tenant railroads. I.U. Railway itself has no connecting tracks between the belt railway and union tracks. At the present, only B & O and Penn Central of the tenant railroad have tracks connecting directly with union tracks.

7. Operations over the belt railway are of three types:

(1) "Industry traffic" is rail traffic to and from industries located on the belt railway.

(2) "Bridge traffic" (also called "tenant road traffic" or "through traffic") is rail traffic over the belt between connecting lines of the same railroad.

(3) "Transfer traffic" (also called "interchange traffic") is rail traffic, loaded or empty, originating on the lines of one tenant railroad and which is transferred via the belt to the lines of another tenant railroad.

8. Operations over union tracks also are of three types:

(1) "Industry traffic" is rail traffic to and from industries located on union tracks. At the time of trial there was only industry being served by union tracks.

(2) Passenger traffic to and from union station. At the time of trial two passenger trains per day were being run over union tracks.

(3) "Through freight traffic" is rail freight traffic to and from points beyond union tracks which uses union tracks as a bridge in traversing between those points.

9. Transfer and industry traffic over both the belt railway and union tracks is powered by I.U. Railway engines and manned by I.U. Railway crews. Bridge and

through traffic over the belt railway and union tracks is powered and crewed by the tenant railroads.

10. This litigation concerns the apportionment among the tenant railroads of the operating expenses of I.U. Railway with respect to (1) transfer traffic over the belt railway, and (2) through freight traffic over union tracks.

### III. *The 1883 Operating Agreement*

11. By agreement dated September 20, 1883 (hereinafter the "Operating Agreement"), five railroads which were the owners of certain rail properties in the City of Indianapolis agreed to convey those properties to I.U. Railway, agreed to extend and improve the rail properties, and provided that seven other railroads could become admitted to the joint use of the properties upon signing copies of the Operating Agreement. I.U. Railway and the present tenant railroads and their predecessors in interest have operated continuously under the Operating Agreement from September 20, 1883, to the present except that The Indianapolis Southern Railway, predecessor in interest to I.C.G., did not commence operations under the Operating Agreement until April 30, 1906.

12. Five paragraphs of the Operating Agreement are of particular relevance to this action:

(a) Paragraph Seventh provides that interest at the rate of seven percent per annum shall be computed on the appraised value of I.U. Railway property; that that amount shall constitute fixed rental to be paid annually to I.U. Railway by the railroads using I.U. Railway property; and that the fixed rental shall be divided into as many equal shares as there are railroad companies using the I.U. Railway, with each user railroad paying one share.

(a) Paragraph Eight provides, in pertinent part, as follows:

"Eighth—The tracks of the Union Railway Company shall be used exclusively, as far as possible, for passenger train service and such local freight deliveries as may be necessary in consequence of loca-tion of freight houses and private sidings; all other freight transfers and deliveries shall be made over the Belt Railway. A separate account shall be kept of the use, for purposes aforesaid, of the tracks of the Union Railway Company and of the Belt Railway; also, of all expenses connected with each system, growing out of the maintenance, operation, renewal and replacement of the same, including taxes, assessments, insurance, wages and salaries, and moneys paid for damages to persons or property; and such expense shall be paid by the several companies using each system, in proportion to such use, on the basis of wheelage. In computing such expense, a proper division shall be made of the wages and salaries of employees and officers whose services shall be rendered in connection with both systems."

(c) Paragraph Twelfth in its entirety provides as follows:

"Twelfth.—Subject to the rights of the proprietary companies as heretofore defined, the current operation, maintenance, renewal and repair of said Belt Railway and said Union Railway Company property shall be conducted by a Board of Managers to be composed of one representative from each company using said Union Railway Company property, and under such rules and by such officers and employees as said Board shall prescribe. The President of said Union Railway Company shall be *ex-officio* chairman of said Board of Managers. Said Board of Managers is hereby vested with authority to make rules governing all joint employes, and prescribe the terms and conditions upon which said Belt Railway and said Union Railway Company property may be used in common; also to appoint all officers, agents and employes who may be necessary to conduct the joint business. But no person shall be kept in the service of said Union Railway Company who is, for cause shown, unsatisfactory to any company using said depot. They shall also fix the time of the arrival and departure and regulate the

movement of all trains upon said Union Railway Company property and said Belt Railway. Each company shall receive equal and impartial privileges in the use of said joint property. All financial transactions incident to the maintenance, operation, renewal and replacement of said property shall be conducted wholly through the officers and agents of the Union Railway Company."

(d) Paragraph Thirteenth provides, *inter alia*, that no railroad after the original twelve shall be admitted to use of I.U. Railway property "save with the unanimous consent, duly recorded, of said Board of Managers." Paragraph Thirteenth also provides, as a condition to the admission or continued use of I.U. Railway property, that:

"* * * each and every payment herein provided to be made as rental or cost of operation and maintenance, shall be regularly and promptly made, and that each and every condition herein recited, and every rule and condition that may from time to time be prescribed by said Board of Managers for the joint use of said Belt Railway or Union Railway Company property, or for the conduct of the business of either of the same, shall be fully, faithfully and fairly kept and maintained, and each company by signing the certified copy hereof as aforesaid, covenants and binds itself to pay, observe and perform as herein provided, and that its right to joint use of said property or any part thereof may be terminated absolutely on thirty days' notice from the chairman of said Board of Managers, based upon due action by said Board, in the event of its failure or default in respect to either of the payments, stipulations, obligations or conditions herein set forth or provided for, all of which conditions are hereby declared to be essential. * *"

(e) Paragraph Fourteenth provides that the grant of right of joint use of I.U. Railway property is "made perpetual" to the companies accepting and signing the Operating Agreement, and that the signing rail-

roads are obligated "to forever continue" that joint use.

13. On March 25, 1885, I.U. Railway adopted the provisions of the Acts of 1885, Union Railway Act, IC 8–4–7–1 to 8–4–7–19, and therefore is an Indiana corporation subject to the provisions of the 1885 Act.

### IV. *The 1930 Agreement*

14. By agreement dated December 27, 1930 (hereinafter "the 1930 Agreement"), between I.U. Railway and The Cincinnati, Indianapolis & Western Railroad Company, the latter railroad was admitted to the use of the property of I.U. Railway. The 1930 Agreement received the unanimous approval of all railroads entitled to use I.U. Railway property. As here pertinent, the 1930 Agreement provided for a total fixed rental of 12.283 shares to be divided among the user railroads as follows:

| | |
|---|---|
| C.C.C. & St. L. Ry. Co. | 4.000 shares |
| P.C.C. & St. L. R.R. Co. | 4.000 shares |
| N.Y., Chicago & St. L. R.R. Co. | .783 shares |
| C.I. & L. Ry. Co. | 1.000 shares |
| Ill. Central R.R. Co. | 1.000 shares |
| C.I. & W. R.R. Co. | 1.500 shares |
| Total: | 12.283 shares |

In addition, the 1930 Agreement set the total number of votes on the I.U. Railway Board of Managers at 12.5 votes, and apportioned those votes among the user railroads in proportion to the shares of fixed rental paid by each railroad, as follows:

| | |
|---|---|
| C.C.C. & St. L. Ry. Co. | 4 votes |
| P.C.C. & St. L. R.R. Co. | 4 votes |
| N.Y., Chicago & St. L. R.R. Co. | 1 vote |
| C.I. & L. Ry. Co. | 1 vote |
| Ill. Central R.R. Co. | 1 vote |
| C.I. & W. R.R. Co. | 1.5 votes |
| Total: | 12.5 votes |

15. During the period from 1930 until February 1, 1968, the respective railroads exercised the number of votes on the Board of Managers called for in the 1930 Agreement. Correspondingly, each railroad paid the number of shares of the fixed rental called for in the 1930 Agreement.

16. The 1930 Agreement also contains the following provision:

"2. In accepting such admission said The Cincinnati, Indianapolis & Western Railroad Company, expressly approves

the practices now in effect by said The Indianapolis Union Railway Company with respect to its bills and charges, and the method of calculation and computation thereof, against its tenant companies (meaning all of the companies using the properties and facilities of said the Indianapolis Union Railway Company) under said Agreement of September 20, 1883, as so amended, including the method of apportioning taxes on the Belt Railroad which was approved by the Board of Managers of The Indianapolis Union Railway Company at its meeting on October 30, 1929, and agrees that said practices constitute compliance with the provisions of said Agreement of September 20, 1883, as so amended."

### V. *The Penn Central Merger*

17. As of January, 1968, the railroads engaged in the joint use of I.U. Railway property were N & W, B & O, the Monon Railroad, Illinois Central Railroad Company, The Pennsylvania Railroad Company and the New York Central Railroad Company. Subsequent to January, 1968, the Pennsylvania Railroad Company and the New York Central Railroad Company merged and formed what was later to be known as Penn Central Transportation Company. The Monon Railroad was merged into the L & N and the Illinois Central Railroad Company was merged with Gulf, Mobile & Ohio Railroad Company to form I.C.G.

18. After February, 1968, Penn Central paid 8 shares of the total fixed rental shares of I.U. Railway. Correspondingly, Penn Central exercised 8 of the 12.5 votes of the Board of Managers. Similarly, each other railroad exercised since 1968 the number of votes consistent with the number of shares of fixed rental paid. Those other votes are as follows:

| | |
|---|---|
| N & W | 1 vote |
| L & N | 1 vote |
| I.C.G. | 1 vote |
| B & O | 1.5 votes |

### VI. *This Action*

19. This litigation concerns the validity of three resolutions of the I.U. Railway Board of Managers, each of which effected certain changes in the method of apportioning operating expenses of I.U. Railway among the tenant railroads. Under Paragraph Eighth of the Operating Agreement, quoted above, operating expenses are to be borne by the railroads using I.U. Railway property "in proportion to such use, on the basis of wheelage." Each of the resolutions received a majority but less than all, of the votes on the Board of Managers.

### a. *The Transfer Resolutions*

20. I.U. Railway's original complaint in four counts, filed June 5, 1974, sought to recover from N & W and B & O certain sums allegedly due I.U. Railway under resolutions of the Board of Managers dated September 5, 1973, and December 6, 1973, respectively (hereinafter collectively referred to as the "transfer resolutions").

21. The transfer resolutions concerned the method of allocating among the tenant railroads the operating expenses of I.U. Railway attributable to transfer traffic on the belt railway. Prior to October 1, 1973, wheelage charges attributable to cars moving as transfer traffic over the belt were billed to the tenant railroad which delivered the cars to the I.U. Railway. The September 5 resolution provided as follows:

"RESOLVED: That effective October 1, 1973, the road haul carrier will pay the I.U. Railway mileage charges for both the loaded and the empty movement of unit grain trains. And this is to include units of 5, 6, 10, 25, 65 and 100 grain trains."

The December 6 resolution provided as follows:

"RESOLVED: That the mileage payments to the I.U. Railway will accrue to the carrier receiving the road haul revenue for both, loaded and empty traffic originating in the Indianapolis reciprocal switching district, effective January 1, 1974."

The September 5 resolution received 8 affirmative votes all of which were attributable to Penn Central's representation on the

Board of Managers. All of the remaining 4.5 votes on the Board were cast against the resolution. The December 6 resolution also received 8 affirmative votes from the Penn Central. I.C.G.'s representative abstained from voting, and the remaining 3.5 votes of N & W, B & O and L & N were cast against the resolution.

22. By its counterclaim, B & O sought to restrain I.U. Railway from implementing or enforcing the transfer resolutions. I.U. Railway thereafter filed two amendments to its complaint adding, in Counts V through VIII, the remaining tenant railroads (or their trustees) and trustee Huttig as parties defendant. Counts V through VIII sought relief in the alternative against those defendants in the event Counts I through IV against N & W and B & O were not sustained. In addition, both Penn Central and L & N filed counterclaims seeking to have the Court fix and determine the rights of those parties in relation to the other parties to the action.

23. During the period from October 1, 1973, to the date of the trial, N & W and B & O have refused to pay charges in accordance with assessments made under the transfer resolutions but have only made payments consistent with the assessment practices in effect prior to the effective date of those resolutions. During the same period, L & N has paid all charges assessed against it under the transfer resolutions, but under protest. Penn Central and I.C.G. have paid all charges under the resolutions without protest.

b. *The Through Freight Resolution*

24. The third Board of Managers' resolution at issue in this litigation is challenged in the counterclaim filed by I.C.G. That resolution (hereinafter "the through freight resolution"), dated May 16, 1973, eliminated an assessment for through freight traffic over union tracks of twenty-five cents per car and engine mile. The through freight resolution received 9.5 affirmative votes on the Board of Managers, 8 from the representatives of Penn Central and 1.5 from the representative of B & O. The remaining 3

votes of N & W, L & N and I.C.G. were cast against the resolution. Although their representatives voted against the resolution, N & W and L & N do not here contest the through freight resolution.

VII. *The Parties' Principal Contentions*

25. I.U. Railway makes the following principal contentions:

(a) The Operating Agreement and the Union Railway Act confer upon the Board of Managers the authority to make changes in the method of allocating expenses pursuant to the Board's express authority to prescribe the terms and conditions upon which the properties of I.U. Railway are to be used in common.

(b) The authority to change the methods of allocating expenses under the Operating Agreement does not require a unanimous vote by the Board of Managers.

(c) The action of the Board of Managers in adopting the resolutions in question is consistent with past practices of the Board of Managers in changing expense apportionment methods.

(d) Because of changed conditions in the railroad industry, the actions of the Board of Managers in adopting resolutions which changed the methods of allocating expenses for transfer traffic and for through freight traffic were an appropriate exercise of the power of the Board of Managers.

26. N & W and B & O make the following principal contentions:

(a) N & W and B & O contend that the parties, by their and their predecessors' actions, have interpreted the Operating Agreement to preclude any changes by the Board of Managers in the methods of allocating the expenses of I.U. Railway to the various tenant railroads, except by the unanimous consent of the tenant railroads. They urge that the case of *Illinois Central R. R. v. Indianapolis Union Ry.,* 6 F.2d 830 (7th Cir. 1925), is controlling in this case and compels a holding that the transfer resolutions were beyond the power of the Board of Managers by vir-

tue of a "practical construction" placed on the Operating Agreement by the parties.

(b) B & O further contends that the 1930 Agreement requires I.U. Railway to maintain the methods of apportioning expenses among the tenant railroads which were in effect at the time the 1930 Agreement was signed, except upon the unanimous approval of all tenant railroads.

(c) B & O further contends that the action of Penn Central, acting in and through the I.U. Railway Board of Managers, violates certain of the Penn Central merger conditions imposed by order of the Interstate Commerce Commission ("I.C.C."). *See Pennsylvania R. R.–Merger–New York Central R. R.,* 327 I.C.C. 475, 564 (1966). Specifically, B & O alleges that Penn Central has closed off Indianapolis traffic in unit grain trains to competing carriers in violation of the following so-called "DT&I conditions" established by the I.C.C. merger order:

"1. The merged company shall maintain and keep open all routes and channels of trade via existing junctions and gateways unless and until otherwise authorized by this Commission.

\*       \*       \*       \*       \*       \*

"3. The present traffic and operating relationships existing between PRR and NYC, on the one hand, and all lines connecting with their tracks, on the other, shall be continued by the merged company insofar as such matters shall be within its control."

(d) B & O lastly contends that the Court lacks jurisdiction to resolve the present dispute and that any disputes regarding charges for I.U. Railway services must be resolved by the I.C.C.

27. The I.C.G.'s principal contention relative to its counterclaim is that use of union tracks for through freight traffic violates Paragraph Eighth of the Operating Agreement and that in the absence of the twenty-five cents charge, an unfair financial benefit accrues to those railroads, namely B & O and Penn Central, which make use of union tracks for through freight traffic. The relief sought by I.C.G. is an order setting aside the through freight resolution and reinstating the twenty-five cent assessment retroactive to June 1, 1973; or, in the alternative, an accounting whereby Penn Central and B & O would be required to pay those amounts which they would have been assessed had the through freight trains operated by them over union tracks since June 1, 1973, been operated over the belt railway instead.

VIII. *Summary of Prior Changes Resulting in Reallocation of Expenses*

28. No evidence was presented of any significant changes in the manner of operation or the allocation of expenses of I.U. Railway during the period from 1883 to 1891. In 1891, I.U. Railway began allocating operating expenses based upon new classifications of traffic. The effect of the change in 1891 was to allocate the expenses of I.U. Railway to the tenant railroads in a different fashion than had been used theretofore.

29. The change brought about in 1891 was recommended to the Board of Managers by a special committee during the summer of 1890. By less than a unanimous vote, the Board voted to adopt and implement the committee's recommendations. Afterwards, the vote was reconsidered and the matter put over to the next meeting.

30. No evidence was presented by the parties that anybody other than the Board of Managers brought about the 1891 change or that the Board considered such a resolution as beyond its power. The inference to be drawn from the evidence is that the changes implemented in 1891 resulted from the action of the Board of Managers. The Court does not infer from the evidence that the Board's action was by unanimous vote. Neither was there any evidence that at that time any of the tenant railroads contended that a unanimous vote was required by the Operating Agreement.

31. At a meeting of the Board of Managers in 1915, the Board by less than unani-

mous votes resolved to approve two methods of allocating expenses which had been in effect since sometime after 1883 and to continue in effect those same methods.

32. In 1946, the Board of Managers passed several resolutions which once again changed expense apportionment practices significantly and resulted in a different allocation of expenses to the tenant railroads. Documents leading up to the passage of the resolutions indicate, and the Court so finds, that the changes were made in response to changes in the railroad industry which tended to render the existing practices inequitable to various of the tenants.

33. In 1959, the Board of Managers adopted by a less than unanimous vote a resolution requiring tenant railroads which used union tracks for through freight traffic to pay an additional twenty-five cents per car and engine mile charge for such use. The resolution recites, and the Court so finds, that this change in billing practice was made by the Board in response to changes in the use of union tracks. Amounts received pursuant to the resolution were credited to the operation of the belt railway. The effect of this resolution was to achieve a different allocation of expenses than had been utilized before for the same type of traffic. Though the resolution was adopted by less than a unanimous vote, the tenant railroads accepted the corresponding financial benefits and detriments resulting from the assessment from 1959 to 1973. There is no evidence that any tenant railroad protested that the action of the Board in adopting the assessment exceeded the power of the Board of Managers, or that the action was invalid for lack of unanimity.

34. At various times throughout the history of the Board of Managers, the Board considered or adopted, in light of changed or changing conditions, other proposed changes in the methods of apportioning expenses among the tenant railroads. The preponderance of the evidence shows that the tenant railroads prior to at least 1960, and probably thereafter, considered the reallocation of expenses as consistent with the power conferred upon the Board by the Operating Agreement. The Court finds and concludes from the evidence that the Board of Managers since 1883 has from time to time exercised authority to reallocate expenses in response to changed conditions to provide a more equitable division of expenses among the tenant railroads.

IX. *Background and Passage of Resolutions In Dispute In This Litigation*

a. *Transfer Resolutions*

35. Many changes in the railroad industry occurred during the period following World War II. In the late 1960's, unit grain train traffic came into popular use, predominantly for the shipment of grain to the east coast for export. In 1970 the first unit grain trains moved over the belt railway. Unit grain train traffic resulted in mass shipments of grain over the belt in trains of from 50 to 100 cars.

36. Penn Central is the only tenant railroad which has grain industries located on its lines which ship unit grain trains via the belt railway. All of the tenant railroads except L & N have used the belt railway at various times in connection with unit grain trains from which those railroads derived the road haul revenue. In a typical grain train movement empty cars are assembled and delivered to I.U. Railway by the road haul carrier, are transferred to the lines of Penn Central by I. U. Railway via the belt, and are then hauled by Penn Central to the industry for loading. The loaded cars are hauled back and delivered by Penn Central to I.U. Railway, which transfers the cars to the lines of the road haul carrier. The road haul carrier transports the loaded cars to their destination and thereby earns the road haul revenue. Penn Central is required to accept the empty cars and return the loaded cars to I.U. Railway. Under the method of allocating expenses for transfer traffic in effect prior to October, 1973, Penn Central was billed for I.U. Railway's charges for the loaded cars which Penn Central delivered to I.U. Railway for transfer to the road haul carrier. The evidence was undisputed that the Penn Central sustained substantial loss-

es in 1972 because it was required to pay I.U. Railway wheelage charges for unit grain trains being returned to N & W and B & O over the belt railway.

37. Penn Central did receive a reciprocal switching charge for switching empty cars into and loaded cars out of the grain industries located on its tracks. The preponderance of the evidence showed that the reciprocal switch charge does not and was not intended to cover the expenses of moving the unit grain trains over I.U. Railway as an intermediate carrier.

38. The effect of the September 5 resolution was to place the burden of paying I.U. Railway charges for unit grain train traffic upon the road haul carrier receiving the road haul revenue from that traffic. The evidence showed that since the adoption of the September 5 resolution, B & O has increased the volume of its unit grain train traffic using the belt. In addition, I.C.G. began using the belt to handle unit grain train traffic on October 30, 1975, over two years after the passage of the resolution, I.C.G. has subsequently handled significant amounts of unit grain train traffic and continues to actively solicit more.

39. Indianapolis Power & Light Company (IPALCO) is an industry located on the lines of I.C.G. For a number of years, Penn Central or its predecessor has hauled large quantities of coal from southern Indiana for delivery to IPALCO via I.U. Railway and I.C.G. In more recent times the coal has been transported in unit coal trains. Penn Central receives the road haul revenue from such shipments. Under the method of allocation of expenses in effect prior to January, 1974, I.C.G. was required to pay the charges of I.U. Railway for coal trains being returned to Penn Central. There was no evidence presented that the reciprocal switch charge received by I.C.G. was intended to cover the charges allocated to I.C.G. for the movement of coal trains over I.U. Railway. The undisputed evidence showed that I.C.G. was sustaining losses by having to pay the charges of I.U. Railway for unit coal trains returned to Penn Central, for which trains it was receiving no portion of the road haul charges.

40. The resolution of December 6, 1973, changed the allocation of expenses for all transfer traffic to the same basis as that adopted for unit grain trains in the September 5 resolution. Thus, as a result of the two transfer resolutions, all charges for transfer traffic moving over the I.U. Railway, including coal train traffic, are uniformly allocated to the carrier receiving the road haul revenue for the cars moved.

41. The undisputed evidence presented at trial showed that as of the end of February, 1976, the change in the method of allocating expenses for I.U. Railway transfer traffic resulted in the following decreased charges to Penn Central and I.C.G. below the charges which would have been allocated under the previous method:

(a) Penn Central $252,186.04
(b) I.C.G. $985,162.50

The evidence further showed that as of that same date, the change had produced the following increased charges for B & O, N & W and L & N, over and above the charges which would have been allocated under the previous method:

(a) L & N $314,851.25
(b) B & O $473,567.85
(c) N & W $448,929.44

None of the tenant railroads affected adversely by the transfer resolutions have disputed that the bills submitted by I.U. Railway were in accordance with the requirements of the resolutions but have only contested the validity of the resolutions themselves.

42. By reason of the Court's involvement in interim efforts to keep I.U. Railway financially operative during the period prior to a decision in this case, the Court takes judicial notice of the fact that Penn Central, B & O, N & W and I.C.G. advanced sums to I.U. Railway for which the parties are entitled either to receive credits or to have sums returned.

b. *Through Freight Resolution*

43. Union tracks have long been used to varying degrees for the movement of through freight traffic. Such movements

were permitted with the knowledge, approval and at the discretion of the Board of Managers. Prior to 1959, in those instances where such traffic was permitted, no additional charge beyond the normal wheelage charge was assessed against any railroad for operating its through freight trains over union tracks.

44. By 1959 the amount of passenger traffic had diminished substantially from the earlier days, particularly since World War II. There was a corresponding increase in the use of union tracks for through freight traffic. In 1959, the Board of Managers adopted a resolution by less than unanimous vote imposing a twenty-five cents per car and engine mile assessment for through freight trains operating over union tracks. This assessment was in addition to the regular charges for union tracks expenses based upon wheelage.

45. Passenger traffic over union tracks experienced further substantial declines during the period from 1959 to 1973. Through freight traffic continued to increase during the same period. In 1973, the Board of Managers by less than unanimous vote passed the through freight resolution which rescinded the twenty-five cents per car and engine mile assessment. Testimony by personnel from I.U. Railway showed that because of the volume of industry traffic over the belt railway, particularly in the southwest quadrant where major customers of I.U. Railway are located, the through freight traffic being moved over union tracks could not be handled over the belt railway without creating congestion and substantial delays in traffic.

46. There was no evidence presented at trial which would allow the Court to determine the extent to which the volume of traffic over union tracks or the belt railway would have been different had the twenty-five cents assessment remained in effect after June 1, 1973. There was no evidence presented which indicated the increased costs which would have been incurred by I.U. Railway if the freight traffic had been diverted to the belt railway, and there was no evidence that in 1973 the twenty-five cents charge bore any relationship to the amount of charges which the railroad would have incurred had their traffic been routed over the belt instead of over union tracks.

## CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Court makes the following conclusions of law.

47. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 by reason of the diversity of citizenship of the parties.

48. This Court is not deprived of jurisdiction over this action by reason of its subject matter. This is an action to recover unpaid charges assessed in conformance with unambiguous resolutions of plaintiff's Board of Managers. The controversy involves the interpretation of an agreement, the power conferred by the agreement and the enforcement of that agreement. No party has contested the reasonableness of the charges of I.U. Railway for transfer or through freight services nor has any party challenged the reasonableness of the resolutions upon which the charges are based.

49. The resolutions upon which the contested bills of I.U. Railway are based are valid and legally binding by reason of the authority vested in the Board of Managers under Paragraph Twelfth of the Operating Agreement, wherein the Board of Managers is expressly given the power to determine the terms and conditions upon which the belt railway and union railway property may be used in common by the tenant railroads. Moreover, because the grant from the original owner railroads was in perpetuity, it was necessarily contemplated by the parties to the Operating Agreement that changes would have to be made by the Board of Managers to meet unforeseen or changing conditions in the railroad industry.

50. The exercise of the Board's power to prescribe the terms and conditions upon which the belt railway and union railway property may be used in common does not require a unanimous vote of the Board.

In the one instance in which the parties to the Operating Agreement intended that unanimity by the Board be required (admission of new user railroads), they clearly and expressly stated that intent in the Operating Agreement. The 1930 Agreement, insofar as it established the Board votes of each user railroad so as to correspond to the proportion of fixed rental paid by that railroad, is valid and binding upon the tenant railroads. No party to this action has sought to reform or rescind either the Operating Agreement or the 1930 Agreement.

51. There has been no practical construction of the relevant provisions of the agreement by the parties or their predecessors which has served to alter, limit or remove the power vested in the Board of Managers under Paragraph Twelfth of the Operating Agreement. Accordingly, the doctrine of practical construction does not here preclude the Board of Managers from altering the method of allocating expenses among the tenant roads.

52. The transfer resolutions adopted by the Board of Managers do not violate the requirement of Paragraph Eighth of the Operating Agreement that the apportionment of the expenses be made "in proportion to * * * use, on the basis of wheelage."

53. The case of *Illinois Central R. R. v. Indianapolis Union Ry.*, 6 F.2d 830 (7th Cir. 1925), is distinguishable from the case at hand. *Illinois Central* does not prohibit the Board of Managers from changing a billing practice of long standing but merely holds that the plaintiff railroad therein could not challenge, as being contrary to the Operating Agreement, a practice long in effect which is also ratified upon its admission to use of I.U. Railway. Similarly, the 1930 Agreement did not prohibit I.U. Railway, by and through its Board of Managers, from changing existing expense apportionment practices, but merely acknowledged that the then existing practices did not conflict with the Operating Agreement.

54. The transfer resolutions do not violate the DT&I conditions included in the I.C.C. order approving the Penn Central merger for three reasons. First, B & O has failed to present sufficient evidence to meet its burden of proof of a "commercial closing" of a route or channel of trade. B & O continues to make a profit on unit grain trains and in fact has increased the number of such trains since the passage of the transfer resolutions. The testimony of B & O's marketing witness to the effect that the resolutions will make Indianapolis a "one railroad town" is contradicted both by B & O's actions and by the experience of I.C.G., which has initiated profitable unit grain train operations since the passage of the resolutions. N & W presented no evidence whatsoever of a commercial closing as to it. Second, assuming the merger conditions are at all applicable to actions taken by the I.U. Railway Board of Managers or to the effects of those actions, the Penn Central merger order in 1966 applied by its terms only to "existing" or "present" traffic. The only evidence presented at trial of any commercial impairment related solely to large unit grain trains. Such traffic did not move over I.U. Railway until 1970. Third, the Court construes the Penn Central merger conditions not to limit the contractually established power of the merged company's representatives on I.U. Railway's Board of Managers to approve expense allocation resolutions not inconsistent with the Operating Agreement. Like the court in *Interstate Commerce Comm'n v. Southern Ry.*, 380 F.Supp. 386 (M.D.Ga.1974), this Court believes that, under these circumstances, it would be unfair to subject I.U. Railway "to obligations which certainly were not expressly considered at the times the [DT&I] conditions were imposed and which are, at best, not readily apparent from the language of the conditions themselves." 380 F.Supp. at 399, n. 26.

55. Issues raised as to the reciprocal switch charges received by the tenant railroads and their amounts are not determinative of the question before this Court, *i. e.*, the power of the Board of Managers to change the method of allocating belt railway expenses among the tenant railroads.

■ 56. The Operating Agreement does not forbid the use of union tracks for through freight traffic. Paragraph Eighth provides that the Union Railway Company's tracks "shall be used exclusively, *as far as possible,* for passenger train service and such local freight deliveries as may be necessary in consequence of location of freight houses and private sidings; all other freight transfers and deliveries shall be made over the Belt Railway." (Emphasis added). Because of changed conditions relating to the use of union tracks for industry and passenger traffic and because of congested conditions on the belt railway, it has become impractical to rely upon the belt railway exclusively for through freight trains. This Court cannot substitute its judgment for that of the Board in allowing continued use of union tracks for through freight traffic nor can the Court say that under current conditions this use of union tracks is contrary to the relevant provisions of Paragraph Eighth.

■ 57. Under the power and authority of Paragraph Twelfth of the Operating Agreement, the Board could eliminate the twenty-five cents per car and engine mile assessment. Though the elimination of the twenty-five cent assessment works to the financial detriment of certain railroads and to the financial benefit of others, this Court cannot substitute its judgment for that of the Board of Managers. Furthermore, even if the Court were to substitute its judgment for that of the Board of Managers, the Court has insufficient evidence before it from which to effect an allocation of expenses that would amount to anything more than impermissible speculation.

58. I.U. Railway has sustained its burden of proof on Counts I, II, III and IV of the complaint and is entitled to judgment against the N & W and B & O. Because Counts V through VIII are in the alternative, the questions raised by such counts are moot.

59. The defendants B & O, N & W and I.C.G. have failed to sustain their burden of proof relating to their defenses and counterclaims and accordingly the defenses and counterclaims asserted by such parties are denied.

60. The defendants L & N and the trustees of the Penn Central are entitled to relief on their counterclaims consistent with Counts I, II, III and IV of the complaint and should be granted relief in accordance therewith.

■ 61. I.U. Railway is entitled to receive damages from the defendant N & W in the amount of $448,929.44 representing damages for unpaid charges for periods up to and including February 28, 1976, with prejudgment interest thereon at the rate of eight percent per annum calculated from thirty days after the date each bill was rendered.

62. I.U. Railway is entitled to receive damages from the defendant B & O in the amount of $473,567.85 representing the amount of unpaid charges for periods up to and including February 28, 1976, with prejudgment interest thereon at the rate of eight percent per annum calculated from thirty days after the date each bill was rendered.

63. N & W and B & O are entitled to receive credits against such judgments for any amounts advanced to I.U. Railway for interim funding.

64. Penn Central and I.C.G. are entitled to a return of any amounts advanced to I.U. Railway for interim funding.

Dated: February 4, 1977

WILLIAM E. STECKLER
Judge, United States District Court,
Southern District of Indiana

## JUDGMENT

The Court having heard and considered the evidence and having made its findings of fact and conclusions of law herein, it is hereby Ordered, Adjudged and Decreed that:

(a) Plaintiff, The Indianapolis Union Railway Company, is hereby granted judgment against defendant Norfolk and Western Railway Company on Counts I and II of

its complaint. Plaintiff shall have and recover of and from such defendant the sum of $448,929.44, with prejudgment interest thereon at the rate of eight percent per annum calculated from thirty days after the date each unpaid bill was rendered. Such defendant shall receive a credit against this judgment in the amount of any sums advanced to plaintiff for interim funding, less any amounts due plaintiff for the month of March, 1976, by reason of the decision in this case.

(b) Plaintiff, The Indianapolis Union Railway Company, is hereby granted judgment against defendant The Baltimore & Ohio Railroad Company on Counts III and IV of its complaint. Plaintiff shall have and recover of and from such defendant the sum of $473,567.85, with prejudgment interest thereon at the rate of eight percent calculated from thirty days after the date each unpaid bill was rendered. Such defendant shall receive a credit against this judgment in the amount of any sums advanced to plaintiff for interim funding, less any amounts due plaintiff for the month of March, 1976, by reason of the decision in this case.

(c) Defendants The Baltimore & Ohio Railroad Company and Illinois Central Gulf Railroad Company shall take nothing by their respective counterclaims.

(d) Defendants Norfolk and Western Railway Company and The Baltimore & Ohio Railroad Company are to bear any costs of this action attributable to the claims brought against them. Defendant Illinois Central Gulf Railroad Company is to bear any costs of this action attributable to its counterclaim.

(e) Defendant Louisville & Nashville Railroad Company is granted judgment on its counterclaim. No amounts are owing to Louisville & Nashville Railroad Company by reason of the Court's decision in this case.

(f) Defendants Robert W. Blanchette, Richard C. Bond, and John McArthur, trustees of the property of Penn Central Transportation Company, are granted judgment

on their counterclaim. Said defendants are entitled to receive amounts advanced to plaintiff for interim funding.

(g) Defendant Illinois Central Gulf Railroad Company is entitled to receive amounts advanced to plaintiff for interim funding.

(h) In order to effectuate all the judgments with the corresponding credits, the defendants Norfolk and Western Railway Company and the Baltimore & Ohio Railroad Company shall pay to the Clerk of the Court any and all amounts required by this judgment, and such amounts shall be paid out by the Clerk to the appropriate parties upon further order of this Court.

Dated: February 4, 1977

/s/ WILLIAM E. STECKLER
Judge, United States District Court,
Southern District of Indiana.